## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **MARY BUCKSBAUM SCANLAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.** |
| | ) | |
| **MARSHALL EISENBERG, EARL** | ) | |
| **MELAMED, NEAL, GERBER &** | ) | |
| **EISENBERG, LLP, an Illinois limited** | ) | |
| **liability partnership, and GENERAL** | ) | |
| **TRUST COMPANY, a South Dakota** | ) | |
| **corporation,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

Plaintiff Mary Bucksbaum Scanlan ("Mary"), by her attorneys, for her complaint against defendants Marshall Eisenberg ("Eisenberg"), Earl Melamed ("Melamed"), Neal, Gerber & Eisenberg, LLP ("NGE") and General Trust Company ("GTC"), states as follows:

## NATURE OF THE ACTION

1.      This is an action to redress repeated acts of attorney malpractice and breaches of the fiduciary duties owed to Mary by her attorneys at NGE and the actions by those attorneys that unlawfully assisted GTC in breaching the fiduciary duties that it owed to Mary as the trustee of the trusts that once held over two billion dollars in assets for Mary's benefit.

2.      Mary was born in 1969 and she is the only natural born child of Melva and Martin Bucksbaum ("Martin"). Martin, along with his brother, Matthew Bucksbaum ("Matthew"), was responsible for the creation over several decades of a vast real estate empire, with their efforts culminating in the creation of General Growth Properties, Inc. ("GGP"). When Martin died in 1995, GGP was publicly traded on the New York Stock Exchange and was one of the largest real estate investment trusts in the United States.

3.      Beginning when Mary was a child, Martin established a series of trusts for her benefit (which are described below and are referred to collectively herein as "Mary's Trusts" or the "Trusts").  Martin's brother, Matthew, similarly established a series of trusts for his family, including trusts for the benefit of his daughter, Ann Friedman, and his son, John Bucksbaum ("John").

4.      Beginning by at least the 1980's, NGE, through Eisenberg, simultaneously represented both Martin and Matthew individually and the business entities that Martin and Matthew established in connection with their real estate ventures and other investments.

5.      NGE, acting primarily through Eisenberg, created a situation in which NGE simultaneously represented: (1) GGP and its affiliates, (2) Mary's Trusts, which were heavily invested in GGP, (3) the myriad entities that were created by NGE as investment vehicles for both Mary's Trusts and the trusts established for the benefit of other Bucksbaum family members, (4) Mary as an individual and (5) other members of the Bucksbaum family, who held top executive level positions at GGP.  Eisenberg also served as GGP's Corporate Secretary from at least 1992 to 2004.

6.      In addition to these conflicting attorney-client representations, NGE established GTC in the late 1980s to serve as the corporate trustee for Mary's Trusts and as the trustee for other trusts that had been established for the benefit of other Bucksbaum family members.  NGE also acts as counsel for GTC.  While NGE was counsel to both GTC and Mary individually, NGE systematically implemented a series of transactions in which GTC replaced the existing trustees of Mary's Trusts, transactions that furthered the self-interests of Eisenberg, Melamed and NGE.  As a result, GTC now acts as the sole corporate trustee for all of Mary's Trusts and it controls the vast majority of her assets.  Eisenberg and Melamed, who are both partners in NGE, also personally control GTC.  Eisenberg is the majority owner of GTC, the President of GTC, a

2

member of GTC's Board of Directors and one of the three members of GTC's Trust Committee. Melamed also serves on GTC's Board of Directors, as GTC's Secretary and as the second member of GTC's three member Trust Committee.

7.     In addition to these conflicting roles, Eisenberg and Melamed also individually own stock in GGP – a fact that gives rise to yet another conflict of interest.

8.     As a result of these conflicts, NGE, Eisenberg and Melamed placed themselves in a situation in which they were rendered incapable of satisfying their professional obligations to render independent, objective legal advice in their role as Mary's counsel and ensuring that GTC satisfied its fiduciary responsibilities to properly manage the assets of Mary's Trusts for her benefit.  For example, in addition to the significant legal fees that have been paid to NGE by GGP, Mary's Trusts and Mary individually over the past several decades, Eisenberg placed himself in a position to gain additional remuneration as a result of his ownership interest in GTC. In addition, as GGP's stock price plummeted during 2008 – from an all time high of $67.43 in 2007 to below $1.00 per share in November 2008 – NGE, Eisenberg and Melamed, acting through GTC, sacrificed hundreds of millions of dollars of the non-GGP assets held by Mary's Trusts, without disclosure to Mary, to satisfy loan obligations that GTC, NGE, Eisenberg and Melamed undertook through M.B. Capital Partners III (hereinafter referred to as "MB Capital Partners") to buy more GGP stock in 2008.  MB Capital Partners is one of the partnership entities that had been established by NGE to act as an investment vehicle for Mary's Trusts and the trusts of other members of the Bucksbaum family.  Furthermore, without disclosure to Mary, GTC, NGE, Eisenberg and Melamed caused assets owned by Mary's Trusts to be used to make personal unsecured loans totaling at least $90 million dollars to two officers of GGP for the purpose of allowing those officers to meet margin calls associated with their holdings of GGP stock as GGP teetered toward insolvency.

9.  As a result of the defendants' wrongful conduct, the value of Mary's Trusts has been reduced by more than three hundred million dollars.

## PARTIES

10.  Plaintiff Mary Bucksbaum Scanlan is a citizen of the State of Colorado.

11.  Defendant Marshall E. Eisenberg is a citizen of the State of Illinois.

12.  Defendant Earl N. Melamed is a citizen of the State of Illinois.

13.  Defendant Neal Gerber & Eisenberg LLP is an Illinois limited liability partnership with its principal place of business in Chicago, Illinois. On information and belief, all of the partners of NGE are residents of states other than Colorado.

14.  Defendant General Trust Company is a South Dakota trust corporation with its principal place of business in Sioux Falls, South Dakota.

## VENUE AND JURISDICTION

15.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a). The citizenship of the parties is diverse and the amount in controversy exceeds $75,000.

16.  Venue is proper pursuant to 28 U.S.C. §1391(a).

## THE CREATION OF MARY'S TRUSTS

17.  In December 1972, when Mary was three years old, Martin established three trusts primarily for her benefit – known as the MBA Trust, the MBB Trust and the MBC Trust (hereinafter collectively referred to as the "MB Trusts"). Originally, the MB Trusts each named an individual as the trustee and provided that the beneficiary of the MB Trusts had the power to remove any corporate trustee. The assets of the MB Trusts included partnership interests in a number of real estate oriented limited partnerships and a variety of other investments.

18.  In November 1973, Martin created a series of trusts known as the Martin Investment Trusts A, B, C and F for Mary's benefit. Like the MB Trusts, the assets of the

Martin Investment Trusts also included partnership interests in real estate ventures and other investments. In May 1997, GTC and NGE consolidated the four Martin Investment Trusts, which then held hundreds of millions of dollars in assets, into a single trust known as the Martin Investment Trust G. Mary does not have any right as the beneficiary to remove GTC as the corporate trustee of the Martin Investment Trusts.

19.     In 1984, Martin's other brother, Maurice Bucksbaum, established the Appleton Trust, which initially was a partner in a shopping center development, for Mary's benefit. The Appleton Trust provided that Mary, as the trust beneficiary, retained the power to remove the corporate trustee.

20.     In 1993, NGE represented Mary individually in connection with the creation of the Mary Bucksbaum Trust, which was created to hold assets that Martin had previously invested for her benefit. NGE drafted the Mary Bucksbaum Trust documents and, consistent with NGE's uniform practice with respect to the other trusts that it drafted for Mary's benefit, the trust provides that GTC will be the sole corporate trustee without any right of the beneficiary to remove GTC.

21.     In December 2002, Matthew created the MBS Trust and that trust included assets that were previously invested by Martin in offshore accounts for Mary's benefit. NGE prepared the MBS Trust documents and GTC was again appointed as the trustee of the MBS Trust, with Mary being the primary beneficiary. The MBS Trust documents once again provide GTC with the sole power to designate successor trustees.

## NGE'S REPRESENTATION OF GGP

22.     Beginning by at least the mid-1980's, NGE, acting primarily through Eisenberg, continuously represented Martin and his brother Matthew in connection with their business ventures. NGE's relationship with Martin and Matthew was so close that when they were in the

process of relocating their business headquarters from Des Moines, Iowa to Chicago in the 1990s, NGE initially housed those businesses and their key employees in its Chicago offices.

23.     In 1993, Martin and Matthew formed GGP as a real estate investment trust.  GGP conducts its business through GGP Limited Partnership ("GGP LP") and GGP is the sole general partner of that entity.  In 1993, GGP conducted an initial public stock offering, in which approximately 19 million shares of GGP were issued at a price of $22 per share.

24.     On information and belief, in the years following GGP's initial public offering, GGP remained one of NGE's largest clients.  At all relevant times, Eisenberg, Melamed and NGE had a duty to protect GGP's interests.

25.     SEC filings made by GGP from 1992 to 2004 repeatedly indicate that Eisenberg was serving as GGP's Secretary.  SEC filings made by GGP from 1997 to 2005 also indicate that Eisenberg was one of the persons who was authorized to hold proxies on behalf of GGP shareholders and vote those proxies at GGP's annual meetings.  As a result of NGE's representation of GGP and Eisenberg's other relationships with GGP and its officers, including Matthew and John, Eisenberg, Melamed and NGE were well-informed regarding GGP's operations and its overall financial position.

26.     On information and belief, Eisenberg and Melamed also personally own thousands of shares of GGP stock.  In January 2009, Eisenberg owned 50,000 shares of GGP and Melamed owned 5,000 shares.

27.     In June 1995, Martin Bucksbaum died unexpectedly.  Mary's uncle Matthew and his son, John, took over operational control of GGP and John eventually succeeded Matthew as Chief Executive Officer of GGP in 1999.  John remained as GGP's Chief Executive Officer until he was forced to resign after GGP collapsed during 2008 and after it was disclosed, as discussed below, that he arranged for certain Bucksbaum family trusts, including Mary's Trusts, to loan at

least $90 million to other GGP insiders to allow them to meet margin calls related to their GGP stock holdings.  Mary has never been employed by GGP or had any role in its operations.

## NGE'S REPRESENATION OF MARY

28.  Throughout Mary's adult life, NGE, acting primarily through Eisenberg, has continually acted as her personal counsel.  In that role, NGE has represented Mary in a variety of contexts, including all matters related to Mary's Trusts, in situations where NGE advised her to establish additional trusts for the benefit of her family, in connection with numerous real estate transactions and construction contracts, in the creation of Mary's family foundation, in tax and estate planning matters, in business ventures and in other personal financial matters.  As a result, and at all relevant times, Mary reasonably understood that Eisenberg, Melamed and NGE were her attorneys.

29.  NGE has represented Mary for approximately 20 years.  During that time, no one from NGE has ever discussed the firm's actual or potential conflicts of interest with Mary, sought a waiver from her with respect to any conflict of interest or suggested that she should retain independent counsel with respect to any matter.  Nor did anyone from NGE ever tell Mary that NGE did not represent her in matters relating to her Trusts or that NGE's representation of Mary was limited to any particular matters.

30.  For example, in May 1989, NGE and Eisenberg represented Mary when she established the Mary E. Bucksbaum Grantor Income Trust, which is now known as the Mary Bucksbaum Family Trust (the "Mary Family Trust").  The Mary Family Trust, as drafted by NGE, provides that GTC is the sole corporate trustee and it does not grant Mary or anyone else a right to remove GTC as trustee.

31.  Following her father's death in 1995, Eisenberg met with Mary and gave her an overview of the assets that were being held in trust for her benefit.  While Mary was generally

aware that trusts had been established for her, the meeting with Eisenberg was the first time that Mary became aware of the extent of the assets in those trusts.

32.     During 1997, Eisenberg advised Mary that she needed an estate plan and NGE subsequently prepared a will for her.  In that will, GTC and Matthew are named as the co-executors of her estate.  Mary's will, drafted by NGE, provides for the disposition of Mary's rights under her Trusts.

33.     During 2003, NGE again represented Mary individually in the formation of the "Mary Bucksbaum Scanlan Insurance Trust" and during that same year Eisenberg advised Mary that she should amend her estate plan.  Under the revised estate plan drafted by NGE and executed by Mary pursuant to NGE's advice, GTC was named as the trustee of the Mary Bucksbaum Scanlan Insurance Trust and GTC was named as the sole executor and trustee of Mary's estate.

34.     During 2004, NGE provided advice to Mary and represented her when she established the Martin Michael Scanlan Exclusion Trust for the benefit of her son.  GTC is the trustee of the Martin Michael Scanlan Exclusion Trust and no one has the right to remove GTC.

35.     During 2006, NGE again provided advice to Mary and represented her when she established the Stella Clare Scanlan Exclusion Trust for the benefit of her daughter.  GTC is the trustee of the Stella Clare Scanlan Exclusion Trust and no one has the right to remove GTC.

36.     Since 2006, NGE and Eisenberg have continued to represent Mary individually with respect to a variety of matters.

### NGE'S CREATION OF GTC TO ACT AS TRUSTEE
### FOR BUCKSBAUM FAMILY MEMBERS' TRUSTS

37.     On information and belief, in April 1989, Eisenberg and NGE incorporated GTC in South Dakota to serve as corporate trustee for Mary's Trusts and numerous other trusts that had been established for the benefit of other members of the Bucksbaum family.  At all times

material hereto, Eisenberg individually has owned 60% of GTC. Eisenberg also is a member of GTC's Board of Directors, GTC's President and one of the three members of GTC's Trust Committee. Eisenberg's NGE partner, Melamed, also is a GTC Director, GTC's Secretary and the second member of GTC's three member Trust Committee. NGE also acts as counsel to GTC. As a result of their positions and Eisenberg's controlling ownership interest, Eisenberg, Melamed and NGE dominate the operations of GTC and control its Trust Committee.

38. The creation of GTC, along with the attorney-client relationships formed between NGE and members of the Bucksbaum family, placed Eisenberg, Melamed and NGE in a position in which they were acting as counsel for both the trustee of the Bucksbaum family trusts and the beneficiaries of those trusts, including Mary. In particular, NGE, Eisenberg and Melamed facilitated a series of transactions whereby GTC replaced all of the existing trustees for Mary's Trusts and the trustees for numerous other trusts established for the benefit of the Bucksbaum family. Thereafter, NGE repeatedly advised members of the Bucksbaum family to name GTC as the sole trustee whenever new trusts were established, without providing the beneficiary with any right to remove GTC as the trustee.

39. For example, in December 1989, NGE, acting through Eisenberg, facilitated a series of transactions whereby the existing trustees for Mary's Trusts (and other Bucksbaum family trusts) resigned their positions and GTC became the sole successor corporate trustee for the MB Trusts, the Martin Investment Trusts and the Appleton Trust. At the time of those transactions, Mary was 20 years old and she was never advised by NGE that she should consult with independent counsel as to the advisability of installing GTC as the sole trustee of her Trusts. In addition, Mary was never advised that NGE had conflicts of interest arising from its representation of GTC, Eisenberg's ownership stake in GTC or as a result of NGE's ongoing representation of GGP, other members of the Bucksbaum family and Mary individually.

Eisenberg drafted the Martin Investment Trusts in a way that was contrary to Mary's interests because they did not grant her the authority to change the trustee.

## THE BREACHES OF THE DUTIES OWED TO MARY

40.     According to an investment report provided to Mary by GTC for the year ending 2002, GGP stock then comprised approximately 65% of the total assets in Mary's Trusts. That same investment report indicated that the assets of Mary's Trusts were worth more than $650 million.

41.     In a March 5, 2003 letter to Mary, which accompanied a December 31, 2002 "Beneficial Trusts Report," GTC stated:

> Your trust asset values and performance have been affected in the past by one major element: GGP stock, which has been approximately 65% of your trusts' allocation. However, non-GGP financial assets have also provided important diversification. As you are aware, during 2003 your asset allocation mix will change so that although GGP stock will be a major holding, but there will be substantially more diversification. Look for these changes to be reflected in upcoming reports. *We feel this diversification is good for your trusts and should reflect a more diverse portfolio return and more managed risk discipline.*
>
> Since the beginning of this year the trust assets have been positioned conservatively. We remain very cautious during this uncertain time and continue to stay with our disciplined strategy to preserve assets while managing a prudent strategy for growth.

(emphasis added.)

42.     In August 2003, GTC sent Mary a report, dated as of June 30, 2003, indicating that the MBS Trust had been created to hold over $300,000,000 in assets that had previously been managed by CIBC Trust Company. GTC became the trustee of MBS Trust in 2003.

43.     On November 9, 2004, GTC caused M.B. Capital Partners III to enter into a term loan agreement with Citigroup Global Markets, Inc. (hereinafter referred to as the "Citi Loan"). Under the terms of the Citi Loan, Citigroup Global Markets made a commitment to loan MB

Capital Partners up to $500,000,000 to finance the exercise of warrants previously issued by GGP and to purchase common stock of GGP. As collateral for the Citi Loan, MB Capital Partners was required to deposit cash, stocks, treasury bills or investment grade corporate bonds. NGE was involved in the drafting of the Citi Loan documents and Eisenberg is listed as a person who must receive copies of all notices sent to the borrower. Neither Eisenberg, Melamed nor GTC disclosed the existence of the Citi Loan to Mary when it was established. During 2004, GTC used the proceeds of the Citi Loan to purchase more than 2.7 million additional shares of GGP stock for the benefit of Mary's Trusts.

44.     On May 18, 2005, Eisenberg sent Mary a copy of her quarterly trust report for the period ending December 31, 2004 on NGE letterhead. The December 31, 2004 trust report indicates that the concentration of Mary's Trusts' assets in GGP was 62% of the more than $1.6 billion in assets held by Mary's Trusts.

45.     In 2006, according to the reports provided by GTC, the concentration of Mary's Trusts' assets in GGP rose to 69% of the more than $2.2 billion in reported trust assets. Contrary to its 2003 acknowledgement that it was in Mary's interests to decrease the exposure of Mary's Trusts to GGP, GTC's trust statements indicate that GTC caused more shares of GGP to be purchased for the benefit of Mary's Trusts. In addition, GTC was reducing the amount invested in relatively safe "cash and fixed income investments" by tens of millions of dollars.

46.     On January 31, 2006, GTC sent Mary a letter regarding a purported "independent audit" of her Trusts for the period ending December 31, 2004. In the letter, GTC wrote:

> This past year, as part of the goal of continuing to meet the highest fiduciary standards, the trust company's officers were authorized to obtain an independent audit of certain trusts. Included were the trust's [sic] listed above for which you are the primary beneficiary. Accordingly, enclosed for your information, are the audit reports for these trusts performed for the period ending December 31, 2004 by the Certified Public Accounting firm of Michael Silver & Company.

There is no indication as to which of the "trust company's officers," which included Eisenberg as GTC's President, decided to hire Michael Silver & Company – a small Skokie, Illinois based accounting firm with fewer than 20 partners. However, while GTC's letter claims that Michael Silver & Company is an independent auditor, one of the partners of Michael Silver is Burton M. Eisenberg – the brother of Marshall Eisenberg. The fact that GTC retained Eisenberg's brother's accounting firm to perform a purportedly "independent audit" of GTC's activities undermines GTC's claim that it was attempting to meet the "highest fiduciary standards" by obtaining an "independent audit" and is another example of Eisenberg's abuse of the power that he held at GTC.

47.     By letter dated March 6, 2007, GTC notified Mary that it had again hired Michael Silver & Company to "undertake an annual financial examination of its fiduciary accounts" and it sent her a purported "Independent Auditors' Report" for her Trusts. Once again GTC, Eisenberg and Melamed failed to disclose to Mary that the "independent auditor" hired by GTC was Eisenberg's brother's firm.

48.     In the spring of 2007, GGP's stock price topped out at an all time high of $67.43. On or about August 2, 2007, with the involvement of NGE, GTC and Eisenberg, the Citi Loan was amended and the amount of the credit line was increased from $500,000,000 to $800,000,000. Once again, neither GTC nor NGE notified Mary of the existence of the Citi Loan. During August 2007, GTC used the proceeds of the Citi Loan to purchase more than 5.4 million additional shares of GGP stock for the benefit of Mary's Trusts at a cost of more than $268,000,000.

49.     By September 2007, GGP's stock price had declined to approximately $53 per share. On or about September 18, 2007, without any disclosure to Mary, GTC caused assets from her Trusts to be used to extend a $40 million unsecured loan to a GGP insider, Bernard

Freibaum, who was then the Chief Financial Officer of GGP (the "Freibaum Loan"). Specifically, GTC caused Mall Investment, L.L.C. ("Mall Investment"), an investment vehicle that GTC had previously represented would be used to invest assets from Mary's Trusts in "a conservative bond mix," to make the unsecured Freibaum Loan. The purpose of the loan, according to the Demand Promissory Note, was to allow Freibaum to satisfy his "margin calls" at his broker and the loan's interest rate was set at the extremely low London Interbank Offered Rate (the "LIBOR Rate"), a rate that did not adequately take into consideration the risk of loss to Mary's Trusts associated with making the unsecured loan. On information and belief, the margin calls related to Freibaum's purchases of huge quantities of GGP stock during 2007 and his subsequent purchases during 2008. On information and belief, Eisenberg negotiated the Freibaum Loan with Freibaum. NGE also drafted the Freibaum Loan Demand Promissory Note. The GTC trust reports also indicate that, as of September 30, 2007, the concentration of Mary's Trusts' assets in GGP rose to over 70% of the more than $2.4 billion in reported trust assets.

50.     In a letter dated November 28, 2007, more than three years after the establishment of the Citi Loan, a trust report sent by GTC to Mary first referred to the existence of a loan between MB Capital Partners and "Citigroup/Smith Barney." In particular, GTC wrote:

> This [trust] report will reflect the purchase of additional shares of General Growth Properties stock by MB Capital Partners III. Your trusts will benefit from this increased holding to the extent of their ownership interest in MB Capital Partners III. Funds for the purchase of this stock have been provided through a favorable rate loan from Citigroup/Smith Barney which will be paid primarily from the quarterly dividends received from the newly acquired stock and other sources.

Neither Eisenberg, Melamed, NGE nor GTC disclosed to Mary the risks involved with the Citi Loan.

51.     According to the trust report for the period ending December 31, 2007, which was sent to Mary on or about March 5, 2008, the continuing decline in the value of the GGP stock

held by Mary's Trusts resulted in a decline in value of more than $320,000,000 and that decline, coupled with other declines, reduced the stated value of the assets held by Mary's Trusts to approximately $1.8 billion. There is no record of any sales of GGP stock in the trust report for the period ending December 31, 2007.

52.     By January 2008, GGP's stock price had fallen by approximately 50% in less than a year and the stock was trading at approximately $36 per share.

53.     On or about January 16, 2008, GTC caused Mall Investment to enter into an amendment to the Freibaum Loan that increased the unsecured loan commitment from $40 million to $65 million. On information and belief, Eisenberg negotiated the amendment of the Freibaum Loan, representing Mall Investment. NGE also drafted the amendment to the Freibaum Loan. Nonetheless, none of Eisenberg, Melamed, NGE or GTC disclosed to Mary the existence of the Freibaum Loan.

54.     On or about February 21, 2008, GTC caused Mall Investment to make a second multi-million dollar unsecured loan to another GGP officer. Specifically, by means of a Demand Promissory Note drafted by NGE, Mall Investment loaned $10 million to Robert Michaels, the then President and Chief Operating Officer of GGP (the "Michaels Loan"). As with the Freibaum Loan, the stated purpose of the Michaels Loan was to allow Michaels to meet margin calls with his broker and the note also provided for interest at the extremely low LIBOR Rate, a rate that did not adequately take into consideration the risk of loss to Mary's Trusts associated with making the unsecured loan. On information and belief, Eisenberg negotiated the Michaels Loan, representing Mall Investment. NGE also drafted the Michaels Loan. Nonetheless, neither Eisenberg, Melamed, NGE nor GTC disclosed to Mary the existence of the Michaels Loan.

14

55.     In the first quarter of 2008, notwithstanding the decline in the price of GGP stock, GTC's trust reports indicate GTC continued to use the Citi Loan to purchase more than $47,000,000 worth of additional GGP stock for the benefit of Mary's Trusts.

56.     By letter dated March 14, 2008, GTC notified Mary that "[t]he CPA firm of Michael Silver & Company has now completed its annual financial examination of General Trust Company's fiduciary accounts."  GTC, Eisenberg and Melamed once again failed to disclose to Mary that Eisenberg's brother was a partner in the firm that was hired to be the "independent auditor" of her Trusts.

57.     From April 2008 through the end of 2008, GGP stock went into a freefall and its price fell to less than $2.00 per share.

58.     On information and belief, on or about April 29, 2008, GTC caused MB Capital Partners to enter into a Second Amendment to the Citi Loan, which extended the maturity date for MB Capital Partners' repayment of any advances to November 9, 2011.  On information and belief, Eisenberg negotiated the terms of the Second Amendment to Term Loan Agreement and NGE drafted the Second Amendment.  Nonetheless, neither Eisenberg, Melamed, NGE nor GTC disclosed to Mary the terms of this Second Amendment or the status of the Citi Loan.

59.     On information and belief, during the Summer of 2008, Freibaum continued to purchase additional GGP stock by using the proceeds from the Freibaum Loan.  According to SEC filings, Freibaum purchased an additional $35 million of GGP stock in May 2008, an additional $2 million shares of GGP stock on June 8, 2008 and an additional $8 million worth of GGP stock on August 6, 2008.

60.     According to GTC's trust report for the period from January 1 through June 30, 2008, the value of Mary's Trusts' investment in GGP had declined by more than $185,000,000 during that six month period.  The trust report indicates that on June 30, 2008, GGP stock still

represented 66% of the total assets held by Mary's Trusts. The trust report contains no record of any sales of GGP stock despite the massive declines in the stock price.

61. On or about August 21, 2008, when GGP's stock was trading at approximately $23 per share, Mall Investment entered into a second amendment to the Freibaum Loan that increased the unsecured loan commitment a second time from $65 million to $80 million. On information and belief, Eisenberg negotiated the second amendment to the Freibaum Loan, representing Mall Investment. NGE drafted the second amendment to the Freibaum Loan. Nonetheless, neither Eisenberg, Melamed, NGE nor GTC disclosed to Mary the existence of the Freibaum loan. In addition, no GTC trust report has ever disclosed the existence of the Freibaum Loan. If Mary had been advised of the intent to make the Freibaum Loan and the Michaels Loan, she would have sought to prevent them from being funded by her Trusts.

62. From September 6, 2008 to October 6, 2008, GGP's stock price plummeted from roughly $27.50 per share to under $7.50 per share. During that same time period, Freibaum sold more than 6 million shares of GGP stock for in excess of $50 million.

63. According to GTC's trust report for the quarter ending on September 30, 2008, the value of Mary's Trusts' investment in GGP had declined by over $900,000,000 since January 1, 2008. The September 30, 2008 GTC trust report indicates that GGP stock, despite the near $1 billion decline in the value of the GGP stock held by Mary's Trusts, still represented 50% of the overall value of the assets held by those Trusts. No GGP stock was sold from Mary's Trusts as of September 30, 2008.

64. On or about October 2, 2008, GTC caused MB Capital Partners to enter into a third amendment of the Citi Loan. The amendment (1) provides that it will be an event of default if a collateral shortfall is not eliminated within one business day, (2) requires that MB Capital Partners repay more than $102,000,000 in advances during the three-week period from

October 3, 2008 through October 22, 2008, (3) contains an agreement by MB Capital Partners to liquidate assets listed as collateral on "Exhibit A" "as soon as possible, and that all proceeds of such liquidations shall be used to repay outstanding Advances" and (4) requires that MB Capital Partners post additional collateral with Citigroup Global Markets. Eisenberg and NGE represented MB Capital Partners in connection with the third amendment to the Citi Loan. Neither Eisenberg, Melamed, NGE nor GTC disclosed to Mary the terms of this Third Amendment or the status of the Citi Loan

65. On October 3, 2008, GGP issued a press release stating that Freibaum "is no longer employed by the Company." The press release also stated:

> All continuing executive officers of the Company have informed the Company that they have repaid in full all previously existing margin loans and thus there will be no further sales of Company stock by those executive officers to satisfy margin calls. *In addition, the Bucksbaum family interests have informed the Company that they have not sold any shares of Company stock and that they do not intend to sell any of their shares of Company stock.* The Company has been informed by Mr. Freibaum that on October 2, 2008, he sold approximately 2.95 million shares of common stock to satisfy margin calls and applied all of the proceeds to repay outstanding margin debts. After those sales, Mr. Freibaum has informed the Company that he beneficially owns approximately 1.3 million shares of stock and has approximately $3.4 million of margin debt outstanding.

(emphasis added.) GGP's press release also stated that its Board of Directors suspended GGP's common stock dividend. Mary was never consulted about the representation that "the Bucksbaum family interests . . . do not intend to sell any of their shares of [GGP] stock" and she never agreed to such a policy. Moreover, the public statement of the intentions of the "Bucksbaum family interests," was contrary to GTC's fiduciary duties to sell some or all of the shares of GGP stock held by Mary's Trusts if it was in her best interests to do so.

66.     In late October 2008, GGP issued a press release indicating that John was resigning as GGP's Chief Executive Officer, at the request of GGP's Board of Directors, and that Robert Michaels was resigning as GGP's President.  That press release also states:

> The Company also announced that it has recently come to the attention of the Board that an affiliate of a Bucksbaum family trust advanced unsecured loans to Mr. Michaels and Bernard Freibaum, the company's former director and CFO, for the purpose of repaying personal margin debt relating to company stock.  The loan to Mr. Michaels, which totaled $10 million, has been repaid in full.  The loan to Mr. Freibaum, whose employment was terminated prior to the Board's knowledge of these loans, totaled $90 million and has $80 million presently outstanding.

> A review by the Company's independent directors concluded that, while the failure to disclose the loans to the Company's Board of Directors did not follow internal company policy, no company assets or resources were involved in the loans and that no laws or Securities and Exchange Commission rules were violated as a result of the loans.

It was only after the issuance of this press release that Mary first learned of the existence of the Freibaum Loan and the Michaels Loan and that her trust assets had been used to make those loans.  Specifically, after another member of the Bucksbaum family demanded that Eisenberg disclose the existence of the Freibaum Loan and the Michaels Loan to Mary, Eisenberg called Mary.  During that call, Mary told Eisenberg that she did not want any amounts to be removed from her Trusts without her consent and Eisenberg responded by telling her that the loans had already been made, but that John had agreed to be responsible for the losses.  At one point, Eisenberg even expressed regret for the fact that John alone would have to absorb the Freibaum Loan losses.  On information and belief, NGE and Eisenberg subsequently created backdated documents related to Mall Investment, which reallocated the Freibaum Loan solely to John's trusts' share of Mall Investment as of January 16, 2008 and reallocated John's trusts' share of other Mall Investment assets in an amount equal to the outstanding balance of the Freibaum Loan to the other members of Mall Investment.

67.     In the Fall of 2008, Mary first learned from a posting made on an internet blog of the existence of the Citi Loan and that the proceeds of that loan had been used to purchase additional shares of GGP. When Mary called Eisenberg for an explanation, particularly for an explanation as to why her Trusts were buying more GGP stock as the stock price was crashing, Eisenberg responded by telling her that the additional purchases were intended to "stabilize" the GGP stock price by showing the market that the Bucksbaum family was continuing to buy stock. Eisenberg also told Mary that "we have done it before."

68.     More than $300,000,000 of the non-GGP related assets held for the benefit of Mary's Trusts have been liquidated and used to repay the amounts due from M.B. Capital Partners to Citigroup Global Markets for the Citi Loan. Mary's Trusts, however, were never a party to the Citi Loan and had no obligation to repay it. Nonetheless, GTC, with NGE's assistance, took non-GGP assets from Mary's Trusts, contributed those assets to M.B. Capital Partners and then sold those assets rather than selling the GGP stock held by M.B. Capital Partners.

69.     From November 2008 to April 2009, GGP's stock traded at below $2.00 per share.

70.     In late February 2009, GTC sent Mary a trust report for the year end 2008. The losses associated with GGP in 2008 are staggering: the report indicates that Mary's Trusts had declined in value by over $1.4 billion in connection with their investments in GGP and that the value of the GGP assets had shrunk from over $1.4 billion to $47.8 million, a decline of more than 96%. The trust report contains no record of any sales of GGP stock in 2008. Instead, as discussed above, GTC, acting at Eisenberg's direction, used the proceeds from the Citi Loan (and ultimately non-GGP assets from Mary's Trusts) during the 2008 to purchase vast quantities of GGP stock. As a result of the enormous losses, the trust report indicates that investments in

GGP had shrunk to less than 6% of the value of the entire portfolio held by Mary's Trusts as of December 31, 2008.

71.     GGP filed for bankruptcy on April 16, 2009 and the New York Stock Exchange suspended trading of its stock on the same date.

72.     An undated "General Trust Company Investment Policy Statement" prepared by GTC further illustrates the egregious nature of GTC's conduct.  In that Policy Statement, GTC stated its belief that GGP securities are a "unique asset" that GTC determined would be exempt from its general investment guidelines and that would not be sold "except when necessary under extraordinary circumstances."  As justification for that policy, GTC referred to the fact that the "Bucksbaum Family remains engaged in the management of GGP" and that the "continued investment in GGP Securities is a fundamental precept for the Trusts in order to fulfill the wishes of the [GGP] founders and the grantors."  Notably, however, GTC does not refer to any provision of Mary's Trusts as supporting GTC's "policy" prohibiting the sale of GGP stock and Mary – unlike her uncle Matthew and her cousin John – has never been "engaged in the management of GGP."  As a result, GTC's Policy Statement is graphic evidence that GTC, acting through Eisenberg and Melamed, breached its fiduciary duties as a trustee to act in Mary's best interests and instead adopted a policy of acting in accordance with what it deemed to be the best interests of the "Bucksbaum Family" as a whole.  The devastating effects of GTC's breaches of its fiduciary duties resulted in GTC's failure to diversify Mary's investments and caused GTC to subordinate her interests to the interests of GGP and other Bucksbaum family members when GTC bought more shares of GGP stock in an attempt to "stabilize" GGP's stock price as the company was sliding toward bankruptcy and ultimately contributed non-GGP assets from Mary's Trusts to M.B. Capital Partners so that those assets could be sold to repay the Citi Loan.

73.     With regard to the non-GGP assets of Mary's Trusts, the undated GTC Investment Policy Statement emphasizes the need to avoid losses and indicates an intent to invest 90% of Mary's non-GGP assets in a "conservative portfolio."  By using the proceeds of the Citi Loan to facilitate the purchase, on margin, of substantial amounts of additional GGP stock despite the already existing concentration of Mary's Trusts' assets in GGP, by using non-GGP assets from Mary's Trusts to satisfy M.B. Capital Partners' obligation to repay the Citi Loan and by making unsecured loans of at least $90 million to GGP officers to facilitate their personal purchases of GGP stock, GTC violated its fiduciary duties to Mary as stated in its own Investment Policy Statement.

74.     On information and belief, NGE, Eisenberg and Melamed have billed and collected from Mary, either directly or indirectly, millions of dollars in legal fees associated with NGE's representation of GTC, the entities established by GTC and NGE to act as investment vehicles for Mary's Trusts, MB Investments LLC (an entity established to act as the Bucksbaum "family office") and NGE's representation of Mary individually in connection with trust, real estate, estate planning and other issues.

75.     As a result of the complex network of trusts created by NGE, the multiple entities established by NGE to act as "investment vehicles" for both Mary's Trusts and the trusts of other Bucksbaum family members, and the lack of detail in the trust reports provided by GTC, Mary does not know at this time whether the defendants have taken other actions that also have breached their fiduciary and other duties to her and caused her additional damages.

### COUNT I
### LEGAL MALPRACTICE
### AGAINST EISENBERG, MELAMED AND NGE

76.     Mary incorporates and realleges Paragraphs 1 through 75 above as if fully set forth herein.

77. Eisenberg, Melamed and NGE had an attorney-client relationship with Mary.

78. As her attorneys, Eisenberg, Melamed and NGE had a duty to advise Mary of any conflicts of interest, including material limitations on their ability to provide her with independent and objective legal advice.

79. As her attorneys, Eisenberg, Melamed and NGE had a duty to advise Mary of any material information necessary to allow her to make informed decisions regarding their representation of her.

80. Eisenberg, Melamed and NGE engaged in legal malpractice by continuing to represent Mary after they became unable to provide independent and objective legal advice to her and by failing to advise her to retain independent legal counsel.

81. Eisenberg, Melamed and NGE engaged in legal malpractice by failing to disclose the existence and terms of the Freibaum Loan and the Michaels Loans to Mary, by failing to advise Mary of the risks that those loans posed to her trust assets and by facilitating the use of non-GGP assets from Mary's Trusts to make those loans.

82. Eisenberg, Melamed and NGE engaged in legal malpractice by failing to disclose the existence and terms of the Citi Loan and the amendments thereto to Mary, including the risks of purchasing on margin additional GGP shares.

83. Eisenberg, Melamed and NGE engaged in legal malpractice by failing to disclose to Mary the option not to liquidate hundreds of millions of dollars of non-GGP assets from her Trusts to repay the Citi Loan in October 2008, which Eisenberg and Melamed, acting through GTC, chose to sell to cover MB Capital Partners' shortfall for the Citi Loan.

84. Had Eisenberg, Melamed and NGE advised Mary of their inability to provide independent and objective legal advice due to their conflicting representations, of the risks associated with the Citi Loan, the Freibaum Loan and the Michaels Loan and of the option not to

22

sacrifice non-GGP assets of Mary's Trusts to repay the Citi Loan, Mary would have prevented those transactions by retaining independent counsel to represent her.

85.     Eisenberg, Melamed and NGE's acts of legal malpractice have caused Mary and her Trusts to suffer hundreds of million of dollars in damages.

**COUNT II**
**BREACH OF FIDUCIARY DUTY**
**AGAINST EISENBERG, MELAMED AND NGE**

86.     Mary incorporates and realleges Paragraphs 1 through 75 above as if fully set forth herein.

87.     Eisenberg, Melamed and NGE had an attorney-client relationship with Mary.

88.     As her attorneys, Eisenberg, Melamed and NGE had a fiduciary duty to act with the utmost fidelity and loyalty to Mary and her interests.

89.     Eisenberg, Melamed and NGE breached their fiduciary duties by representing Mary, Mary's Trusts, GTC, GGP, Mall Investment, MB Capital Partners, numerous other GGP related entities, the trusts established for the benefit of other Bucksbaum family members and other members of the Bucksbaum family with interests in GGP that differed from Mary's interests, without disclosure to Mary of the conflicts arising as a result of those representations or even attempting to obtain her consent.

90.     Eisenberg, Melamed and NGE's representation of Mary and her interests were materially limited by their competing obligations and loyalties to GTC, GGP, Mall Investment, MB Capital Partners, numerous other GGP related entities and the trusts established for the benefit of other Bucksbaum family members, as well as their personal pecuniary interest in the continuation of these attorney-client relationships, Eisenberg's financial interest in GTC and the interests of Eisenberg and Melamed as stockholders of GGP.

91.     Eisenberg, Melamed and NGE breached their fiduciary duty of loyalty to Mary to act with utmost fidelity and loyalty to her interests by engaging in these competing representations.

92.     Eisenberg, Melamed and NGE did not advise Mary to retain independent counsel because it was in their own interests not to do so.

93.     Had Eisenberg, Melamed and NGE advised Mary of their inability to provide independent and objective legal advice due to their competing obligations and loyalties, Mary would have prevented the losses associated with the Citi Loan, the Freibaum Loan and the Michaels Loan by retaining independent counsel to represent her.

94.     Eisenberg's, Melamed's and NGE's breach of their fiduciary duties have caused Mary and her Trusts to suffer hundreds of millions of dollars in damages.

95.     In addition to other damages, Mary is entitled to disgorgement of all attorneys' and other fees paid by GTC, Mary's Trusts, any investment vehicle related to Mary's Trusts or by Mary individually to NGE during all times when Eisenberg, Melamed and NGE were in breach of their fiduciary duties to Mary.

**COUNT III**
**BREACH OF FIDUCIARY DUTY**
**AGAINST GENERAL TRUST COMPANY**

96.     Mary incorporates and realleges Paragraphs 1 through 75 above as if fully set forth herein.

97.     As trustee for Mary's Trusts, GTC owed a fiduciary duty to Mary as beneficiary.

98.     GTC engaged in grossly negligent conduct and breached its fiduciary duty to act with prudence, utmost loyalty and fidelity to Mary, the beneficiary of the Trusts of which GTC was trustee, by engaging in the following acts, that were not in Mary's best interests but instead were undertaken to benefit the interests of others:

      a.       purchasing additional shares of GGP by utilizing the Citi Loan during 2007 and 2008 despite the existing concentration of Mary's Trusts' assets in GGP;

      b.       using non-GGP assets from Mary's Trusts to satisfy M.B. Capital Partners' Citi Loan obligations, thereby sacrificing hundreds of millions of dollars of non-GGP assets to prevent a sale of GGP stock; and

      c.       extending at least $90 million in unsecured loans to GGP corporate insiders Freibaum and Michaels without obtaining adequate security for those loans and charging an interest rate that was inadequate to compensate Mary's Trusts for the risks associated with those loans.

99.     GTC's breaches of its fiduciary duties have caused Mary and her Trusts to suffer hundreds of million of dollars in damages.

**COUNT IV**
**AIDING AND ABETTING GENERAL TRUST COMPANY'S**
**BREACH OF FIDUCIARY DUTY AGAINST**
**EISENBERG, MELAMED AND NGE**

100.    Mary incorporates and realleges Paragraphs 1 through 75 above as if fully set forth herein.

101.    Eisenberg, Melamed and NGE, as counsel to GTC and by virtue of Eisenberg's status as the majority owner of GTC and Eisenberg's and Melamed's status as GTC directors, GTC officers and members of GTC's Trust Committee, aided GTC in performing certain wrongful acts including, but not limited to:

      a.       purchasing additional shares of GGP by utilizing the Citi Loan during 2007 and 2008 despite the existing concentration of Mary's Trusts' assets in GGP;

      b.       using non-GGP assets from Mary's Trusts to satisfy M.B. Capital Partners' Citi Loan obligations, thereby sacrificing hundreds of millions of dollars of non-GGP assets to prevent a sale of GGP stock; and

      c.       extending at least $90 million in unsecured loans to GGP corporate insiders Freibaum and Michaels without obtaining adequate security for those loans and charging an interest rate that was inadequate to compensate Mary's Trusts for the risks associated with those loans.

102.     Eisenberg, Melamed and NGE were aware of their actions and knowingly assisted GTC in breaching its fiduciary duties to Mary by negotiating and implementing the Citi Loan, the Freibaum Loan, and the Michaels Loan, and the repayment of the Citi Loan using non-GGP assets from Mary's Trusts, thereby causing Mary's Trusts to lose hundreds of millions of dollars.

103.     Eisenberg, Melamed and NGE engaged in self-dealing when they knowingly aided and abetted GTC's breach of its fiduciary duties in order to further their own financial interests and the interests of one of NGE's largest clients, GGP.

104.     Eisenberg, Melamed and NGE's acts of aiding and abetting of GTC's breach of its fiduciary duties have caused Mary and her Trusts to suffer hundreds of million of dollars in damages.

## **PRAYER FOR RELIEF**

WEREFORE, plaintiff Mary Bucksbaum Scanlan requests the following relief against defendants Marshall Eisenberg, Earl Melamed, Neal Gerber & Eisenberg LLP, and General Trust Company:

A.     That this Court award Mary damages from all defendants for all of her injuries, plus interest and costs.

B.     That this Court award Mary exemplary and punitive damages from all defendants, except in connection with the legal malpractice claim in Count I.

C.     That this Court remove GTC as trustee for any trust established for the benefit of Mary and for the trusts established by Mary for the benefit of others and appoint a trust company of Mary's choosing as successor trustee for those trusts.

D.     That this Court order defendants to provide a complete accounting for all transactions and affairs with respect to all of the trusts established for the benefit of Mary and for

the trusts established by Mary and to furnish all books and records related to such transactions and affairs.

E.      That this Court order Neal Gerber & Eisenberg to disgorge all attorneys' and other fees paid to it by GTC, Mary's Trusts, any investment vehicles related to Mary's Trusts or by Mary individually received by NGE during all times when Eisenberg, Melamed and NGE were in breach of their fiduciary duties owed to Mary.

F.      That this Court grant Mary any and all other relief that it deems just.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: August 17, 2009

s/ Frederick J. Sperling
Frederick J. Sperling
Paul E. Greenwalt, III
Lawrence H. Heftman
Philip J. Holroyd

SCHIFF HARDIN LLP
6600 Sears Tower
Chicago, IL 60606-6473
(312) 258-5500

Attorneys for Mary Bucksbaum Scanlan