**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **MARY BUCKSBAUM SCANLAN,** | ) | |
| **individually, as Next Friend for** | ) | |
| **MARTIN MICHAEL SCANLAN AND** | ) | |
| **STELLA CLARE SCANLAN, minors,** | ) | |
| **and derivatively on behalf of GENERAL** | ) | |
| **TRUST COMPANY, as Trustee,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:09 cv 5026** |
| | ) | |
| **MARSHALL EISENBERG, EARL** | ) | |
| **MELAMED, NEAL, GERBER &** | ) | |
| **EISENBERG, LLP, an Illinois limited** | ) | |
| **liability partnership, and GENERAL** | ) | |
| **TRUST COMPANY, a South Dakota** | ) | |
| **corporation,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## AMENDED COMPLAINT

Plaintiffs Mary Bucksbaum Scanlan ("Mary"), individually and derivatively on behalf of

General Trust Company (the "Trust Company") as trustee of Mary's Trusts, and Martin Michael

Scanlan ("Martin Michael") and Stella Clare Scanlan ("Stella"), by and through their Next

Friend, Mary, by their attorneys, for their Amended Complaint against Defendants Marshall

Eisenberg ("Eisenberg"), Earl Melamed ("Melamed"), Neal, Gerber & Eisenberg, LLP (the

"Law Firm") and the Trust Company, state as follows:

## NATURE OF THE ACTION

1. This is an action to redress repeated acts of attorney malpractice and breaches

of fiduciary duties. Eisenberg, Melamed and the Law Firm committed legal malpractice and

breached their fiduciary duties to both Mary and the Trust Company. The Trust Company, as

trustee of Mary's Trusts, breached its fiduciary duties to Mary and her children Martin Michael

and Stella.  Eisenberg, Melamed and the Law Firm aided and abetted the Trust Company's breaches.

2.      Mary was born in 1969 and is the daughter of Melva and Martin Bucksbaum ("Martin").  Martin, along with his brother, Matthew Bucksbaum ("Matthew"), were the founders of General Growth Properties, Inc. ("General Growth" or "GGP"), one of the largest publicly traded real estate investment trusts in the United States.

3.      Beginning when Mary was a child, Martin established a series of trusts naming Mary as the primary beneficiary (which are described below in paragraphs 27 through 29 and are referred to collectively herein as "Mary's Trusts" or the "Trusts").  Mary's children, Martin Michael and Stella, are the remaindermen of her Trusts.

4.      The Law Firm, acting primarily through Eisenberg and with Melamed's assistance, simultaneously represented:

      a.      Mary generally, including in her capacity as beneficiary of the Trusts;

      b.      the Trust Company (the trustee of Mary's Trusts, which were heavily invested in General Growth);

      c.      General Growth and its affiliates;

      d.      the entities that the Law Firm created as investment vehicles for both Mary's Trusts and the trusts established for the benefit of other Bucksbaum family members; and

      e.      other members of the Bucksbaum family, some of whom – Martin Bucksbaum (Mary's father), Matthew Bucksbaum (Mary's uncle) and John Bucksbaum (Matthew's son and Mary's cousin) – held top executive level positions at General Growth.

5.      The Law Firm received millions of dollars in legal fees from these representations.

6.      In addition to his legal representation of General Growth, Eisenberg also served as the Secretary of General Growth from April 1993 through October 2008.

7. In addition to these conflicts, Eisenberg and Melamed also individually own stock in General Growth.

8. Eisenberg and Melamed, who are both partners in the Law Firm, also personally control the Trust Company. Eisenberg is the majority owner of the Trust Company, the President of the Trust Company, a member of the Trust Company's Board of Directors and one of the three members of the Trust Company's Trust Committee. Melamed also serves on the Trust Company's Board of Directors, as the Trust Company's Secretary and as the second member of the Trust Company's three member Trust Committee.

9. Through its representation of Mary, the Law Firm systematically substituted the Trust Company for the prior trustees of Mary's Trusts. The Trust Company now is the sole trustee for all of Mary's Trusts and it controls her Trusts' assets.

10. As a result of these conflicts, Eisenberg, Melamed and the Law Firm were rendered incapable of satisfying their professional obligations to provide independent, objective legal advice as Mary's counsel and to act solely in her interests. These conflicts also rendered Eisenberg, Melamed and the Law Firm incapable of satisfying their professional obligations as counsel to the Trust Company as trustee of Mary's Trusts.

11. The Trust Company breached its duties to Mary, Martin Michael and Stella by imprudently purchasing hundreds of millions of dollars in General Growth stock, financed through a margin loan, for the benefit of Mary's Trusts when the Trusts were already highly concentrated in General Growth.

12. Eisenberg, Melamed and the Law Firm aided and abetted the Trust Company's breaches of fiduciary duty as counsel for the Trust Company.

13. In addition, Eisenberg, Melamed and the Law Firm committed legal malpractice by failing to inform Mary that they were unable to represent her due to their

conflicting representations, failing to withdraw from representing Mary due to their conflicts of interest and continuing to represent other clients whose interests conflicted with Mary's.

14. Eisenberg, Melamed and the Law Firm also breached their fiduciary duties to Mary by facilitating and approving the imprudent purchases of additional General Growth stock in their capacity as counsel to the Trust Company, officers and directors of the Trust Company and members of the Trust Company's Trust Committee.

15. None of the Defendants provided advance notice to Mary of the Trust Company's purchases of the additional shares of General Growth.

16. Furthermore, the Trust Company, Eisenberg, Melamed and the Law Firm caused assets owned by Mary's Trusts to be used to make personal unsecured loans totaling at least $90 million to two officers of General Growth for the purpose of allowing those officers to meet margin calls associated with their holdings of General Growth stock. None of the Defendants provided advance notice to Mary of the Trust Company's intent to make those loans.

17. As a result of the Defendants' wrongful conduct, the value of Mary's Trusts has been reduced by more than two hundred million dollars.

## PARTIES

18. Mary Bucksbaum Scanlan is a citizen of the State of Colorado.

19. Martin Michael Scanlan is a citizen of the State of Colorado and, as a minor, brings this action through his Next Friend Mary Bucksbaum Scanlan, who is his mother and custodian.

20. Stella Clare Scanlan is a citizen of the State of Colorado and, as a minor, brings this action through her Next Friend Mary Bucksbaum Scanlan, who is her mother and custodian.

21. Marshall E. Eisenberg is a citizen of the State of Illinois.

22.      Earl N. Melamed is a citizen of the State of Illinois.

23.      Neal Gerber & Eisenberg LLP is an Illinois limited liability partnership with its principal place of business in Chicago, Illinois.  On information and belief, all of the partners of the Law Firm are residents of states other than Colorado.

24.      General Trust Company is a South Dakota trust corporation with its principal place of business in Sioux Falls, South Dakota.

## VENUE AND JURISDICTION

25.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a). The citizenship of the parties is diverse and the amount in controversy exceeds $75,000.

26.      Venue is proper pursuant to 28 U.S.C. §1391(a).

## TRUSTS CREATED NAMING MARY AS PRIMARY BENEFICIARY

27.      In 1972 and 1973, Martin established several trusts naming Mary as the beneficiary – the MBA Trust, the MBB Trust and the MBC Trust (hereinafter collectively referred to as the "MB Trusts") and the Martin Investment Trusts A, B, C and F.  In May 1997, the Trust Company, with the Law Firm's assistance, consolidated the four Martin Investment Trusts into a single trust known as the Martin Investment Trust G.

28.      Mary's uncles, Matthew and Maurice Bucksbaum, also created trusts for her benefit.  Specifically, Maurice established the Appleton Trust in 1984 and Matthew, with the Law Firm's assistance, created the MBS Trust in 2003, both of which named Mary as the primary beneficiary.

29.      The Law Firm drafted or modified several of Mary's Trusts to limit her ability to remove the trustee.  Mary originally had the right to remove the trustee of the Martin Investment Trusts.  The Law Firm, however, prepared an amendment to those trusts, and advised Mary to consent, which took the power to remove the corporate trustee away from Mary and

granted it to the corporate trustee itself. Eisenberg, Melamed and the Law Firm failed to advise Mary to retain independent counsel before she consented. Furthermore, when the Law Firm drafted the MBS Trust, it did not grant Mary the power to remove the trustee, but instead again reserved that power only for the trustee.

### MARY AS BENEFICIARY IS
### THE EQUITABLE OWNER OF THE TRUSTS' ASSETS

30.     As the primary beneficiary of the Trusts, Mary is the equitable owner of the Trusts' assets. Therefore, Mary may sue the Trust Company in equity to redress its breaches of trust.

31.     Mary is eligible to receive all of the Trusts' principal and income. Mary's Trusts contain liberal provisions authorizing the trustee to distribute all of the net income and principal of the Trusts' corpus to Mary as may be necessary for her "support" and "best interests," even if such distributions consume the entirety of the Trusts' assets.

32.     For example, the MBS Trust provides that Mary is the "primary beneficiary" and the trustee is authorized to distribute "all or as much of the net income and or principal, or both" of that trust for her "support" or in her "best interests."

33.     The MBS Trust provides that "[t]he 'support' of a beneficiary shall include his support and maintenance in reasonable comfort, medical care . . . and education."

34.     The MBS Trust further provides that "the 'best interests' of the beneficiary shall be liberally construed by the Trustee and shall contemplate not only distributions necessary for the support of such beneficiary . . . but also distributions for his comfort and convenience."

35.     The Trusts also require that the Trust Company act exclusively in Mary's interests. For example, the MBS Trust provides that the trustee must exercise its powers "for the sole benefit of the beneficiary," which it defines as Mary. In addition, the law requires that trustees act in accordance with their fiduciary duties, including (a) the duty of loyalty, (b) the

duty of prudence and (c) the duty to keep the beneficiary informed of significant developments concerning the trust and its administration, particularly material information needed by beneficiaries for the protection of their interests.

36.     Pursuant to the terms of the Trusts, Mary holds a lifetime and testamentary power to appoint all of the Trusts' assets.  Mary's current will provides for the exercise of her appointment of the Trusts' assets in favor of trusts created for the benefit of her children, Martin Michael and Stella.

37.     Martin Michael and Stella, as Mary's descendants, are remaindermen of Mary's Trusts.  If Mary does not exercise the power of appointment, the assets of her Trusts will be transferred to trusts of which Martin Michael and Stella will be the primary beneficiaries.

## EISENBERG'S, MELAMED'S AND THE LAW FIRM'S REPRESENTATION OF MARY

38.     Throughout Mary's adult life and until 2009, the Law Firm, acting primarily through Eisenberg and with Melamed's assistance, continually acted as Mary's personal counsel for every matter in which she needed legal advice.  In that role, the Law Firm represented Mary in a variety of contexts, including matters related to her Trusts, establishing additional trusts for the benefit of her family, numerous real estate transactions and construction contracts regarding property owned by her Trusts and Mary personally, the creation of Mary's family foundation, tax and estate planning matters, business ventures (e.g., Emaginary LLC), a prenuptial agreement and other personal financial matters.  As a result, and at all relevant times, Mary reasonably believed that Eisenberg, Melamed and the Law Firm were her attorneys for all of her legal needs, including in her capacity as beneficiary of her Trusts.

39.     In May 1989, the Law Firm and Eisenberg represented Mary when she established the Mary E. Bucksbaum Grantor Income Trust, which is now known as the Mary Bucksbaum Family Trust.  The Mary Bucksbaum Family Trust, as drafted by the Law Firm,

provides that the Trust Company is the sole corporate trustee and it does not grant Mary the right to remove the Trust Company as trustee.

40.     In December 1989, Eisenberg and the Law Firm drafted documents whereby the existing trustees for Mary's Trusts resigned their positions and the Trust Company became the sole successor trustee for the MB Trusts, the Martin Investment Trusts and the Appleton Trust.  Mary then executed consents to those designations of successor trustees pursuant to the Law Firm's advice.  Mary was not advised to consult independent counsel before the Law Firm arranged for her to consent to the appointment of the Trust Company or advised of any of the Law Firm's conflicts of interest.

41.     Following Mary's father's death in 1995, Eisenberg met with Mary to advise her about her Trusts' assets.

42.     In 1996, the Law Firm prepared, and Mary executed, exercises of her power of appointment under the Martin Investment Trust G to make charitable contributions from the trust assets to Harvard University, the University of Pennsylvania and the Jewish Federation of Greater Des Moines.

43.     In 1997, Eisenberg and the Law Firm advised Mary that she needed an estate plan.  Eisenberg and the Law Firm represented Mary in her estate planning and prepared a will for her.  In that will, the Trust Company is named as one of the co-executors of her estate.  As part of their estate planning advice, Eisenberg and the Law Firm advised Mary of her rights under the Martin Investment Trust G.  The Law Firm drafted provisions in Mary's will exercising her power of appointment over the remainder of Martin Investment Trust G.  Mary executed her will pursuant to the advice of Eisenberg and the Law Firm.

44.     In 2000, the Law Firm prepared, and Mary executed, an exercise of Mary's power of appointment under the Martin Investment Trust G establishing the Madelyn Family

Trust and transferring assets to the Madelyn Family Trust. In 2000, the Law Firm also prepared, and Mary executed, an exercise of Mary's power of appointment under the Martin Investment Trust G distributing three million dollars of the trust assets to the Martin Bucksbaum Family Foundation.

45.     In its incomplete answers to Mary's First Set of Interrogatories in this action, the Law Firm admits that it performed a wide range of legal services for "Mary and the trusts for which Mary is a beneficiary" from August 2001 through March 2009. The Law Firm's answers disclose that 42 different Law Firm attorneys represented Mary and her Trusts and they list Eisenberg 18 times and Melamed 15 times. In addition, the Law Firm admits that it was paid more than $1.6 million in fees from August 2001 through March 2009 for "work performed for Mary and the trusts for which Mary is a beneficiary."

46.     The Law Firm's interrogatory answers also admit that the Law Firm represented Mary on matters related to her estate plan and her Trusts. For example, in the "Work Performed" column of its answers, the Law Firm repeatedly described the services that it performed as including "tax planning for the Trusts," "estate planning," "year-end planning for the Trusts," "purchase of Mary's interest in General Ute, LLC by one of the Trusts," "general matters relating to the Trusts," "repatriation of off-shore trusts; general matters relating to the Trusts; tax planning for the Trusts" and "review of real estate owned by the Trusts." In addition, the Law Firm's answers are replete with references to work that it performed related to real estate that is owned by the Trusts.

47.     In 2001, the Law Firm prepared, and Mary executed, an exercise of Mary's power of appointment under the Martin Investment Trust G distributing one million dollars of the trust assets to the Martin Bucksbaum Family Foundation.

48.     In 2002, the Law Firm prepared, and Mary executed, an exercise of her power of appointment under the Appleton Trust to distribute certain assets from that trust to Gene and Glenn Bucksbaum.

49.     In 2003, Eisenberg and the Law Firm again represented Mary individually in the formation of the "Mary Bucksbaum Scanlan Insurance Trust" and Eisenberg advised Mary that she should amend her estate plan.  Under the revised estate plan drafted by Eisenberg and the Law Firm and executed by Mary pursuant to the Law Firm's advice, the Trust Company was named as the trustee of the Mary Bucksbaum Scanlan Insurance Trust and the sole fiduciary of Mary's estate.  Eisenberg and the Law Firm also revised Mary's will to provide for the exercise of her powers of appointment, effective upon her death, making her children the beneficiaries of trusts holding the remaining trust assets of the Martin Investment Trust G, the MB Trusts and the Appleton Trust.

50.     In 2004, the Law Firm drafted and Mary executed, pursuant to their advice, the Martin Michael Scanlan Exclusion Trust for the benefit of her son.  The Trust Company is the trustee of the Martin Michael Scanlan Exclusion Trust and only the trustee has the right to remove the Trust Company.  In 2004, the Law Firm also prepared an exercise of Mary's power of appointment under the Martin Investment Trust G distributing one million dollars of the trust assets to the Mary Bucksbaum Scanlan Family Foundation.

51.     In 2006, the Law Firm again provided advice to Mary and represented her when she established the Stella Clare Scanlan Exclusion Trust for the benefit of her daughter. The Trust Company is the trustee of the Stella Clare Scanlan Exclusion Trust and only the trustee has the right to remove the Trust Company.

52.     Eisenberg, Melamed and the Law Firm continued to advise Mary regarding her interests in her Trusts in 2008 and 2009, including seeking her approval of their

recommendation that the Trust Company sell some of the General Growth stock held for the benefit of her Trusts after General Growth's collapse in late 2008. For example, on December 5, 2008, the Law Firm sent two detailed legal memoranda to Mary and other Bucksbaum family members regarding the tax consequences to their trusts of converting limited partnership units of the General Growth Limited Partnership to General Growth common stock, the consequences if General Growth filed for bankruptcy and the Law Firm's recommendation that some General Growth limited partnership units be converted by the Trust Company into stock and sold. The memoranda were directed to Mary on the Law Firm's letterhead and solicited Mary's thoughts about the Law Firm's conclusions and stressed that the Law Firm was available to discuss this matter in greater detail with Mary. On information and belief, Eisenberg and Melamed were involved in the drafting of the December 5, 2008 memoranda.

53.     On December 18, 2008, the Law Firm sent Mary and other Bucksbaum family members another memorandum detailing the Law Firm's legal advice on the conversion of General Growth LP Units into General Growth common stock and the Trust Company's sale of some of the General Growth stock held in Mary's Trusts. Again, the memorandum was sent to Mary on the Law Firm's letterhead. On information and belief, Eisenberg and Melamed were involved in the drafting of the December 18, 2008 memorandum.

54.     On February 24, 2009, the Law Firm sent Mary another legal memorandum advising her regarding the distribution and sale of shares of General Growth stock by her Trusts. Again, the memorandum was sent to Mary on the Law Firm's letterhead. This memorandum included the Law Firm's recommendation of the number of shares to be sold by Mary's Trusts. On information and belief, Eisenberg and Melamed were involved in the drafting of the February 24, 2009 memorandum.

55.     On March 11, 2009, Melamed sent an email to Mary, with a carbon copy to Eisenberg, attaching a schedule "which sets forth the number of General Growth shares distributed form [sic] MB Capital Partners III to trusts for your benefit, the number of General Growth shares sold by such trusts, the estimated loss recognized from such sales and the approximate sales proceeds received in connection with such sales." Melamed ended the email requesting that Mary contact him with any questions.

56.     As the above examples illustrate, the Law Firm has represented Mary for more than 20 years. It initiated contact with her, provided legal advice to her and performed other legal work for her, including preparing legal documents for her signature, with respect to her interests in her Trusts.

57.     During that time, no one from the Law Firm ever addressed the firm's conflicts of interest with Mary or told Mary that the Law Firm could not represent her. The Law Firm never limited the scope of its representation of Mary or advised her that the Law Firm did not represent her in matters relating to her Trusts.

**THE LAW FIRM'S LONG-STANDING SIMULTANEOUS
REPRESENTATION AND CLOSE RELATIONSHIP WITH GENERAL GROWTH**

58.     The Law Firm's representation of Martin and Matthew Bucksbaum's business ventures dates back to at least the mid-1980s. Since General Growth's formation as a real estate investment trust in 1993, the Law Firm has continuously represented General Growth. On information and belief, General Growth was one of the Law Firm's largest clients from 1993 until 2009.

59.     Due to the Law Firm's attorney-client relationship with General Growth, Eisenberg, Melamed and the Law Firm had a duty to act solely in General Growth's interests. Both Eisenberg and Melamed personally represented General Growth on numerous matters.

60.    In addition to his representation of General Growth, Eisenberg served as General Growth's Secretary from April 1993 through October 2008.  SEC filings made by General Growth from 1997 to 2005 also indicate that Eisenberg was authorized to hold proxies on behalf of General Growth shareholders and vote those proxies at General Growth's annual meetings.  As a result of the Law Firm's representation of General Growth and Eisenberg's relationships with General Growth and its officers (including Matthew and John Bucksbaum), Eisenberg, Melamed and the Law Firm were well-informed regarding General Growth's operations and its overall financial position.

61.    On information and belief, at all relevant times, Eisenberg and Melamed also owned thousands of shares of General Growth.  In January 2009, Eisenberg owned 50,000 shares of General Growth and Melamed owned 5,000 shares.

62.    In June 1995, Martin Bucksbaum died unexpectedly.  Mary's uncle Matthew and his son, John, took over operational control of General Growth and John eventually succeeded Matthew as Chief Executive Officer of General Growth in 1999.  John remained General Growth's Chief Executive Officer until he was forced to resign in October 2008 after it was disclosed, as discussed below in paragraph 95, that he arranged, with the assistance of Eisenberg, Melamed and the Law Firm, for certain Bucksbaum family trusts, including Mary's Trusts, to loan at least $90 million to two other General Growth officers, Bernard Freibaum and Robert Michaels, to allow them to meet margin calls related to their General Growth stock holdings.

63.    Unlike Martin, Matthew and John Bucksbaum, Mary has never been employed by General Growth or had any role in its operations.

**THE LAW FIRM'S CONTROL AND SIMULTANEOUS**
**REPRESENTATION OF THE TRUST COMPANY**
**AS TRUSTEE OF MARY'S AND OTHER BUCKSBAUM FAMILY TRUSTS**

64.     The Law Firm's relationship with the Trust Company dates back to the incorporation of the Trust Company as a South Dakota trust company in 1989.

65.     Eisenberg and Melamed dominate the operations of the Trust Company and control its Trust Committee.  Eisenberg owns 60% of the Trust Company, is the Trust Company's President and is a member of the Trust Company's Board of Directors and its three member Trust Committee.  In connection with his ownership interest of the Trust Company, Eisenberg received shareholder distributions of more than $1.5 million from 2005 to 2008. Eisenberg's partner, Melamed, also is a Trust Company Director, the Trust Company's Secretary and the second member of the Trust Company's three member Trust Committee.

66.     Eisenberg, Melamed and the Law Firm also were counsel to the Trust Company.  At all relevant times, Eisenberg, Melamed and the Law Firm have represented the Trust Company in its capacity as trustee of Mary's Trusts.  On information and belief, Eisenberg, Melamed and the Law Firm have provided legal representation to the Trust Company regarding the fiduciary duties it owed to Mary, including its investment and management of the assets in Mary's Trusts.

67.     As described in paragraph 40, Eisenberg, the Law Firm and the Trust Company effectuated transactions that substituted the Trust Company for the prior trustees of Mary's Trusts.  Eisenberg and the Law Firm also effectuated similar transactions whereby the Trust Company replaced the trustees for numerous other Bucksbaum family trusts. Subsequently, Eisenberg and the Law Firm revised the Martin Investment Trusts to delete Mary's power to remove the corporate trustee.  Thereafter, the Law Firm also repeatedly advised members of the Bucksbaum family, including Mary, to name the Trust Company as the sole

trustee whenever new trusts were established, without providing the beneficiary with any right to remove the Trust Company as the trustee.

68.     Eisenberg, Melamed and the Law Firm advised the Trust Company regarding the Citi Loan (as that term is defined below in paragraph 73), which was used to finance the Trust Company's purchase of more than $300 million in additional shares of General Growth for the benefit of Mary's Trusts in 2007 and 2008. Eisenberg, Melamed and the Law Firm also advised the Trust Company regarding the loans that were made to Bernard Freibaum and Robert Michaels (two General Growth officers).

69.     Furthermore, Eisenberg, Melamed and the Law Firm advised the Trust Company and investment vehicles in which the Trust Company invested Mary's Trusts' assets regarding two loans taken out in October 2008 (the "Private Bank Loan" and a subsequent loan from Citibank, N.A. (the "Second Citi Loan") totaling $79 million), which M.B. Capital Partners III, a Bucksbaum family investment vehicle created by the Law Firm, used to partly repay the original Citi Loan. Eisenberg, Melamed and the Law Firm also advised the Trust Company and M.B. Capital Partners III in their liquidation of private equity investments made for the benefit of Mary's Trusts to provide collateral for the Private Bank and Second Citi Loans.

70.     On information and belief, Eisenberg, Melamed and the Law Firm also have routinely represented the Trust Company in its capacity as trustee of other Bucksbaum family trusts.

## EISENBERG, MELAMED, THE LAW FIRM AND THE TRUST COMPANY BREACHED THEIR DUTIES TO PLAINTIFFS

71.     As of the end of 2002, General Growth stock constituted approximately 65% of the total assets in Mary's Trusts.

72.     In 2003, the Trust Company advised Mary that it would increase the diversification of her Trusts' assets by decreasing their concentration in General Growth,

stressing the importance of asset preservation. In a March 5, 2003 letter to Mary, the Trust Company stated:

> Your trust asset values and performance have been affected in the past by one major element: GGP stock, which has been approximately 65% of your trusts' allocation. However, non-GGP financial assets have also provided important diversification. *As you are aware, during 2003 your asset allocation mix will change so that although GGP stock will be a major holding, but there will be substantially more diversification.* Look for these changes to be reflected in upcoming reports. *We feel this diversification is good for your trusts and should reflect a more diverse portfolio return and more managed risk discipline.*
>
> Since the beginning of this year the trust assets have been positioned conservatively. We remain very cautious during this uncertain time and continue to stay with our disciplined strategy to preserve assets while managing a prudent strategy for growth.

(emphasis added.)

73. On November 9, 2004, the Trust Company, represented by the Law Firm, caused M.B. Capital Partners III, an investment vehicle established for the Bucksbaum family trusts, to enter into a term loan agreement with Citigroup Global Markets, Inc. (referred to as the "Citi Loan"), then a client of the Law Firm. Under the terms of the Citi Loan, Citigroup Global Markets made a commitment to loan M.B. Capital Partners III up to $500,000,000 to finance the exercise of warrants previously issued by General Growth and to purchase common stock of General Growth. As collateral for the Citi Loan, M.B. Capital Partners III was required to pledge cash, stocks, treasury bills or investment grade corporate bonds. The Law Firm was involved in the drafting of the Citi Loan documents and Eisenberg is listed as a person who must receive copies of all notices sent to the borrower. During 2004, the Trust Company used the proceeds of the Citi Loan to purchase more than 2.7 million additional shares of General Growth stock for the benefit of Mary's Trusts.

74.     When the Citi Loan was made, the Law Firm also was representing the lender, Citigroup Global Markets, Inc. From 2004 to 2009 it continued to represent both Citigroup Global Markets, Inc. and other affiliated Citi entities in dozens of cases pending in the Circuit Court of Cook County and in the Northern District of Illinois. The Law Firm's representation of both the lender and the borrower at the time of the Citi Loan and at all relevant times thereafter is yet another conflict of interest that was not disclosed to Mary.

75.     On May 18, 2005, Eisenberg sent Mary a copy of her quarterly trust report for the period ending December 31, 2004 on the Law Firm's letterhead. The December 31, 2004 trust report indicates that the concentration of Mary's Trusts' assets in General Growth was 62% of the assets held by Mary's Trusts.

76.     In 2006, according to the reports provided by the Trust Company, the concentration of Mary's Trusts' assets in General Growth rose to 69% of the Trusts' assets. Contrary to its March 5, 2003 acknowledgement that it was in Mary's interests to decrease the exposure of Mary's Trusts to General Growth, the Trust Company's trust statements indicate that the Trust Company increased her Trusts' exposure to General Growth by causing more shares of General Growth to be purchased for the benefit of the Trusts. In addition, the Trust Company's actions reduced the amount invested in "cash and fixed income investments" by tens of millions of dollars.

77.     On or about August 2, 2007, with the advice of Eisenberg, Melamed and the Law Firm, the Trust Company entered into an amendment of the Citi Loan, which increased the credit line from $500,000,000 to $800,000,000. Neither the Trust Company nor the Law Firm notified Mary of the amendment to the Citi Loan or that the Law Firm was simultaneously representing numerous Citi entities. From August 3, 2007 to August 20, 2007, the Trust

Company used the proceeds of the Citi Loan to purchase more than 5.2 million additional shares of General Growth stock for the benefit of Mary's Trusts at a cost of more than $260,000,000.

78.     On or about September 18, 2007, without any disclosure to Mary, the Trust Company caused assets that were held for the benefit of her Trusts to be used to extend a $40 million unsecured loan to a General Growth insider, Bernard Freibaum, who was then the Chief Financial Officer of General Growth (the "Freibaum Loan"). Specifically, the Trust Company caused Mall Investment, L.L.C. ("Mall Investment"), an investment vehicle that the Trust Company had previously stated in trust reports would be used to invest assets from Mary's Trusts in "a conservative bond mix," to make the Freibaum Loan. Eisenberg, Melamed and the Law Firm advised the Trust Company regarding the Freibaum Loan.

79.     The purpose of the Freibaum Loan, according to the Demand Promissory Note, was to allow Freibaum to satisfy his margin calls at his broker and the loan's interest rate was set at the extremely low London Interbank Offered Rate (the "LIBOR Rate"), a rate that did not adequately take into consideration the risk of loss to Mary's Trusts associated with making the unsecured loan. On information and belief, the margin calls related to Freibaum's purchases of huge quantities of General Growth stock during 2007 and his subsequent purchases during 2008. Eisenberg, Melamed and the Law Firm were involved in the drafting of the Freibaum Loan documents.

80.     The Trust Company trust reports also indicate that, as of September 30, 2007, the concentration of Mary's Trusts' assets in General Growth rose to over 70% of the more than $2.4 billion in assets held by Mary's Trusts.

81.     In a letter to Mary, dated November 28, 2007, more than three years after the establishment of the Citi Loan and after the additional General Growth stock purchases in

August 2007, the Trust Company first referred to the existence of a loan between M.B. Capital Partners III and "Citigroup/Smith Barney." In particular, the Trust Company wrote:

> This [trust] report will reflect the purchase of additional shares of General Growth Properties stock by MB Capital Partners III. Your trusts will benefit from this increased holding to the extent of their ownership interest in MB Capital Partners III. Funds for the purchase of this stock have been provided through a favorable rate loan from Citigroup/Smith Barney which will be paid primarily from the quarterly dividends received from the newly acquired stock and other sources.

None of the Defendants disclosed to Mary the risks involved with the Citi Loan.

82.     According to the trust report for the period ending December 31, 2007, which was sent to Mary on or about March 5, 2008, the continuing decline in the value of the General Growth stock held for the benefit of Mary's Trusts resulted in a decline in value of the Trusts of more than $320,000,000 and that decline, coupled with other declines, reduced the stated value of the assets held by Mary's Trusts to approximately $1.8 billion. There were no sales of the General Growth stock held for the benefit of Mary's Trusts for the period ending December 31, 2007.

83.     By January 2008, General Growth's stock price had fallen by approximately 50% in less than a year and the stock was trading at approximately $36 per share.

84.     On or about January 16, 2008, the Trust Company caused Mall Investment, another investment vehicle established for the Bucksbaum family trusts, to enter into an amendment to the Freibaum Loan that increased the unsecured loan commitment from $40 million to $65 million. Eisenberg, Melamed and the Law Firm were involved in drafting the amendment to the Freibaum Loan. None of the Defendants disclosed to Mary the existence of the Freibaum Loan.

85.     On or about February 21, 2008, the Trust Company caused Mall Investment to make a second multi-million dollar unsecured loan to another General Growth officer.

Specifically, by means of a Demand Promissory Note that Eisenberg, Melamed and the Law Firm were involved in drafting, Mall Investment loaned $10 million to Robert Michaels, who was then President and Chief Operating Officer of General Growth (the "Michaels Loan"). As with the Freibaum Loan, the stated purpose of the Michaels Loan was to allow Michaels to meet margin calls with his broker. The note also provided for interest at the extremely low LIBOR Rate, a rate that did not adequately take into consideration the risk of loss to Mary's Trusts associated with making the unsecured loan. None of the Defendants disclosed their intent to make the Michaels Loan to Mary before making that loan.

86.     On March 28, 2008, notwithstanding the decline in the price of General Growth stock to $36 and Mary's Trusts' significant concentration of assets in General Growth, the Trust Company's trust reports indicate that it used the Citi Loan to purchase more than $47,000,000 worth of additional General Growth stock for the benefit of Mary's Trusts. That purchase represented the largest single day purchase of General Growth stock for the benefit of Mary's Trusts during 2007 and 2008.

87.     From April 2008 through the end of 2008, General Growth stock went into a freefall and its price fell to less than $2.00 per share.

88.     On or about April 29, 2008, the Trust Company caused M.B. Capital Partners III to enter into a Second Amendment to the Citi Loan, which extended the maturity date for M.B. Capital Partners III's repayment of any advances to November 9, 2011. Eisenberg and Melamed were involved in drafting the Second Amendment to Term Loan Agreement. None of the Defendants disclosed to Mary the terms of this Second Amendment or the status of the Citi Loan at that time.

89.     According to the Trust Company's trust report for the period from January 1 through June 30, 2008, even after the purchase of more than $47,000,000 worth of additional

General Growth stock for the benefit of Mary's Trusts in March 2008, the value of Mary's Trusts' total investment in General Growth had declined by more than $185,000,000 during that six month period. The trust report indicates that on June 30, 2008, General Growth stock still represented 66% of the total assets held by Mary's Trusts. There were no sales of the General Growth stock held for the benefit of Mary's Trusts in this time period.

90.     On or about August 21, 2008, when General Growth's stock was trading at approximately $23 per share, Mall Investment entered into a second amendment to the Freibaum Loan that increased the unsecured loan commitment a second time from $65 million to $80 million. Eisenberg, Melamed and the Law Firm were involved in drafting the second amendment to the Freibaum Loan, representing Mall Investment. None of the Defendants disclosed to Mary the existence of the Freibaum Loan. In addition, no Trust Company trust report in 2008 disclosed the existence of the Freibaum Loan.

91.     From September 6, 2008 to October 6, 2008, General Growth's stock price plummeted from roughly $27.50 per share to under $7.50 per share. During that same time period, Freibaum sold more than 6 million shares of General Growth stock for in excess of $50 million. During that same time period, the Trust Company sold none of the General Growth stock held for the benefit of Mary's Trusts.

92.     According to the Trust Company's trust report for the quarter ending on September 30, 2008, the value of Mary's Trusts' investment in General Growth had declined by over $900,000,000 since January 1, 2008. The September 30, 2008 trust report indicates that, despite the near $1 billion decline in the value of the General Growth stock held by Mary's Trusts, General Growth stock still represented 50% of the overall value of the Trusts' assets. None of the General Growth stock held for the benefit of Mary's Trusts had been sold as of September 30, 2008.

93.    On or about October 2, 2008, the Trust Company caused M.B. Capital Partners III to enter into a third amendment of the Citi Loan. The amendment (a) provides that it will be an event of default if a collateral shortfall is not eliminated within one business day, (b) requires that M.B. Capital Partners III repay more than $102,000,000 in advances during the three-week period from October 3, 2008 through October 22, 2008, (c) contains an agreement by M.B. Capital Partners III to liquidate assets listed as collateral "as soon as possible, and that all proceeds of such liquidations shall be used to repay outstanding Advances" and (d) requires that M.B. Capital Partners III post additional collateral with Citigroup Global Markets. Eisenberg, Melamed and the Law Firm represented M.B. Capital Partners III in connection with the third amendment to the Citi Loan. None of the Defendants disclosed to Mary the terms of this Third Amendment or the status of the Citi Loan.

94.    On October 3, 2008, General Growth issued a press release announcing that the "Bucksbaum family interests" had informed General Growth that "the Bucksbaum family interests . . . do not intend to sell any of their shares of [General Growth] stock." Mary was never consulted about this statement on behalf of "the Bucksbaum family interests" and she never agreed to such a policy.

95.    In late October 2008, General Growth issued a press release disclosing the Freibaum and Michaels Loans. The press release also stated John Bucksbaum was resigning as General Growth's Chief Executive Officer at the request of General Growth's Board of Directors and that Robert Michaels was resigning as General Growth's President.

96.    It was only after the issuance of this press release that Mary first learned of the existence of the Freibaum Loan and the Michaels Loan and that assets from her Trusts had been used to make those loans. Specifically, after another member of the Bucksbaum family demanded that Eisenberg disclose the existence of the Freibaum and Michaels Loans to Mary,

Eisenberg called Mary. During that call, Mary told Eisenberg that she did not want any amounts to be removed from her Trusts without her consent and Eisenberg responded by telling her that the loans had already been made, but that John Bucksbaum had agreed to be responsible for the losses. On information and belief, the Law Firm and Eisenberg subsequently created backdated documents related to Mall Investment, which reallocated the Freibaum Loan to John's trusts' share of Mall Investment as of January 16, 2008 and reallocated John's trusts' share of other Mall Investment assets in an amount equal to the outstanding balance of the Freibaum Loan to the other members of Mall Investment.

97.     Mary's interest in her Trusts was damaged by the Freibaum and Michaels Loans because a below market interest rate was charged.

98.     In the Fall of 2008, Mary called Eisenberg for an explanation as to why her Trusts had bought more General Growth stock as it was declining. Eisenberg responded by telling her that the additional purchases were intended to "stabilize" the General Growth stock price by showing the market that the Bucksbaum family was continuing to buy stock. Eisenberg also told Mary that "we have done it before."

99.     More than $300,000,000 of the non-GGP related assets held for the benefit of Mary's Trusts were liquidated and used to repay the amounts due from M.B. Capital Partners III to Citigroup Global Markets for the Citi Loan. Specifically, the Trust Company, with the Law Firm's assistance, took non-GGP assets held for the benefit of Mary's Trusts, contributed those assets to M.B. Capital Partners III and then sold those assets. The Trust Company and M.B. Capital Partners III, with the Law Firm's assistance, also liquidated investments in private funds held by Mary's Trusts to provide collateral for the Private Bank and Second Citi Loans that were taken out to help pay off the Citi Loan.

100.     From November 2008 to April 2009, General Growth's stock traded at below $2.00 per share.

101.     In late February 2009, the Trust Company sent Mary a trust report for the 2008 year.  The losses associated with General Growth in 2008 are staggering: the report indicates that Mary's Trusts had declined in value by over $1.4 billion in connection with their investments in General Growth and that the value of the General Growth assets had shrunk from over $1.4 billion to $47.8 million, a decline of more than 96%.  There were no sales of the General Growth stock held for the benefit of Mary's Trusts in 2008.  Instead, as discussed above, the Trust Company, acting at Eisenberg's direction, used the proceeds from the Citi Loan during 2008 to purchase an additional nearly fifty million dollars worth of General Growth stock for the benefit of Mary's Trusts in an effort to stabilize General Growth's stock price.

102.     General Growth filed for bankruptcy on April 16, 2009.

103.     An undated "General Trust Company Investment Policy Statement," prepared by the Trust Company, Eisenberg, Melamed and the Law Firm, states that General Growth securities are a "unique asset" that the Trust Company determined would be exempt from its general investment guidelines and that would not be sold "except when necessary under extraordinary circumstances."  As justification for that policy, the Trust Company referred to the fact that the "Bucksbaum Family remains engaged in the management of GGP" and that the "continued investment in GGP Securities is a fundamental precept for the Trusts in order to fulfill the wishes of the [GGP] founders and the grantors."

104.     Notably, however, no provision of Mary's Trusts supports the Trust Company's "policy" prohibiting the sale of General Growth stock and Mary – unlike her uncle Matthew and her cousin John – has never been "engaged in the management of GGP."  As a result, the Trust Company's Policy Statement demonstrates that the Trust Company, acting

through Eisenberg and Melamed, breached its fiduciary duties as trustee to act solely in Mary's interest and instead adopted a policy of acting in accordance with what it deemed to be the best interests of the "Bucksbaum Family" as a whole.

105. The Trust Company compounded its failure to diversify Mary's Trusts by purchasing additional General Growth shares when Mary's Trusts were already highly concentrated in General Growth. In doing so, the Trust Company subordinated Mary's interests to the interests of General Growth and other Bucksbaum family members in an attempt to stabilize General Growth's stock price.

106. With regard to the non-GGP assets of Mary's Trusts, the undated Trust Company Investment Policy Statement emphasizes the need to avoid losses and indicates an intent to invest 90% of Mary's non-GGP assets in a "conservative portfolio." By using the proceeds of the Citi Loan to facilitate the purchase, on margin, of substantial amounts of additional General Growth stock despite the already existing high concentration of Mary's Trusts' assets in General Growth, by using non-GGP assets from Mary's Trusts as collateral to secure more loans to repay the Citi Loan and by making unsecured loans of at least $90 million to General Growth officers to facilitate their personal purchases of General Growth stock, the Trust Company violated its fiduciary duties to Mary, Martin Michael and Stella.

107. On information and belief, Eisenberg, Melamed and the Law Firm have collected from Mary and her Trusts millions of dollars in legal fees associated with their representation of the Trust Company, the investment vehicles established for the Bucksbaum family trusts, MB Investments LLC (an entity established to act as the Bucksbaum "family office") and Mary in connection with trust, real estate, estate planning and other matters.

108. As a result of the complex network of trusts created by the Law Firm, the multiple entities established by the Law Firm to act as investment vehicles for both Mary's

Trusts and the trusts of other Bucksbaum family members and the lack of detail in the trust reports provided by the Trust Company, Mary does not know at this time whether the Defendants have taken other actions that also have breached their fiduciary and other duties to her and caused additional damages to her Trusts.

**COUNT I**
**MARY'S CLAIM OF LEGAL MALPRACTICE**
**AGAINST EISENBERG, MELAMED AND THE LAW FIRM**

109.     Mary incorporates and realleges paragraphs 1 through 108 above as if fully set forth herein.

110.     Eisenberg, Melamed and the Law Firm had a general attorney-client relationship with Mary, including with respect to her Trusts, and this Count is based on that direct attorney-client relationship.

111.     As her attorneys, Eisenberg, Melamed and the Law Firm had a duty to advise Mary of any conflicts of interest, including material limitations on their ability to provide her with independent and objective legal advice concerning her Trusts.

112.     As her attorneys, Eisenberg, Melamed and the Law Firm had a duty to advise Mary of any material information necessary to allow her to make informed decisions regarding their representation of her concerning her Trusts.

113.     Eisenberg, Melamed and the Law Firm violated their duty of care and engaged in legal malpractice by continuing to represent Mary after they became unable to give her independent and objective legal advice concerning her Trusts and by failing to advise her to retain independent legal counsel.

114.     Eisenberg, Melamed and the Law Firm violated their duty of care and engaged in legal malpractice by failing to disclose to Mary the existence and terms of the Citi

Loan and the amendments thereto and the risks associated with the purchase of additional shares of General Growth for the benefit of her Trusts.

115.     Eisenberg, Melamed and the Law Firm violated their duty of care and engaged in legal malpractice by failing to disclose to Mary the existence and terms of the Freibaum and Michaels Loans, by failing to advise Mary of the risks that those loans posed to her Trusts' assets and by facilitating the use of non-GGP assets from Mary's Trusts to make those loans.

116.     Eisenberg, Melamed and the Law Firm violated their duty of care and engaged in legal malpractice by failing to withdraw from representing Mary due to their conflicts of interest.

117.     Had Eisenberg, Melamed and the Law Firm advised Mary of the risks associated with the purchase of the additional shares of General Growth stock utilizing the Citi Loan during 2007 and 2008 despite the existing concentration of Mary's Trusts assets in General Growth and the Freibaum and Michaels Loans, Mary would have prevented those transactions by retaining independent counsel to represent her.

118.     Had Eisenberg, Melamed and the Law Firm advised Mary of their inability to provide independent and objective legal advice due to their conflicting representations, Mary would have retained independent counsel to represent her who would have prevented those transactions.

119.     Had Eisenberg, Melamed and the Law Firm withdrawn from representing Mary, she would have retained independent counsel to represent her who would have prevented those transactions.

120.     Among other things, independent counsel solely representing Mary's interests would have approached the Trust Company and demanded that it not use the Citi Loan to

purchase more General Growth stock in an attempt to stabilize or inflate the price of General Growth stock. If the Trust Company had refused that demand, independent counsel would have filed an action seeking an injunction prohibiting the additional General Growth purchases – an action that is recognized in Section 199(b) of the Restatement (Second) of Trusts (1959) ("The beneficiary of a trust can maintain suit . . . to enjoin the trustee from committing a breach of trust."). Independent counsel also would have demanded that the Trust Company not make the unsecured Freibaum and Michaels Loans and, if the Trust Company refused that demand, independent counsel would have sought an injunction prohibiting the Trust Company from making those loans using the assets of Mary's Trusts.

121.    Eisenberg, Melamed and the Law Firm's acts of legal malpractice caused damages in the form of a diminution in the value of Mary's Trusts in excess of two hundred million dollars.

122.    Eisenberg, Melamed and the Law Firm's acts of legal malpractice also caused Mary to suffer pecuniary damages in the form of attorney's fees in this action that would have been avoided had Eisenberg, Melamed and the Law Firm provided advance notice of the transactions described in paragraphs 114 and 115.

**COUNT II**
**MARY'S CLAIM OF BREACH OF FIDUCIARY DUTY**
**AGAINST EISENBERG, MELAMED AND THE LAW FIRM**

123.    Mary incorporates and realleges paragraphs 1 through 108 above as if fully set forth herein.

124.    Eisenberg, Melamed and the Law Firm had a general attorney-client relationship with Mary, including with respect to her Trusts, and this Count is based on that direct attorney-client relationship.

125.    As her attorneys, Eisenberg, Melamed and the Law Firm had a fiduciary duty to act with the utmost fidelity and loyalty to Mary and her interests.

126.    Eisenberg, Melamed and the Law Firm breached their fiduciary duty of loyalty to Mary by assisting the Trust Company, when acting as the Trust Company's counsel, with the:

a.    purchase of additional shares of General Growth stock utilizing the Citi Loan during 2007 and 2008 despite the existing concentration of Mary's Trusts' assets in General Growth; and

b.    extension of at least $90 million in unsecured loans to General Growth corporate insiders Freibaum and Michaels without obtaining adequate security for those loans and charging an interest rate that was inadequate to compensate Mary's Trusts for the risks associated with those loans.

127.    Eisenberg, Melamed and the Law Firm also breached their fiduciary duty of loyalty to Mary by approving, when acting in their capacity as directors and officers of the Trust Company and members of the Trust Company's Trust Committee, the purchase of the additional shares of General Growth stock utilizing the Citi Loan during 2007 and 2008 despite the existing concentration of Mary's Trusts' assets in General Growth.

128.    Eisenberg, Melamed and the Law Firm also breached their fiduciary duty of loyalty to Mary to act with utmost fidelity and loyalty to her interests by approving, when acting in their capacity as directors and officers of the Trust Company and members of the Trust Company's Trust Committee, the Freibaum and Michaels Loans.

129.    Eisenberg's, Melamed's and the Law Firm's breach of their fiduciary duties caused damages in the form of a diminution in the value of Mary's Trusts in excess of two hundred million dollars.

130.    In addition to other damages, Mary is entitled to disgorgement of all attorneys' and other fees paid by Mary individually to the Law Firm during all times when Eisenberg, Melamed and the Law Firm were in breach of their fiduciary duties to Mary.

## COUNT III
## MARY, MARTIN MICHAEL AND STELLA'S CLAIMS
## AS THIRD PARTY BENEFICIARIES OF EISENBERG, MELAMED AND NGE'S
## ATTORNEY-CLIENT RELATIONSHIP WITH THE TRUST COMPANY AGAINST
## EISENBERG, MELAMED AND NGE FOR LEGAL MALPRACTICE

131.    Mary, Martin Michael and Stella incorporate and reallege paragraphs 1 through 108 above as if fully set forth herein.

132.    Eisenberg, Melamed and the Law Firm acted as counsel to the Trust Company in its capacity as trustee of Mary's Trusts.

133.    Mary is the primary beneficiary of her Trusts.

134.    Martin Michael and Stella are the remaindermen of Mary's Trusts.

135.    Eisenberg, Melamed and the Law Firm knew that Mary is the primary beneficiary of her Trusts and that Martin Michael and Stella are the remaindermen of Mary's Trusts.

136.    As counsel to the Trust Company in its capacity as trustee of Mary's Trusts, Eisenberg, Melamed and the Law Firm had a duty to advise the Trust Company of its fiduciary duty to manage Mary's Trusts with Mary, Martin Michael and Stella's sole interests in mind.

137.    The primary purpose and intent of Eisenberg, Melamed and the Law Firm's attorney-client relationship with the Trust Company in its capacity as trustee of Mary's Trusts was to benefit Mary, Martin Michael and Stella.

138.    Eisenberg, Melamed and the Law Firm owed Mary, Martin Michael and Stella, as third party beneficiaries of the Trust Company's attorney-client relationship with Eisenberg, Melamed and the Law Firm, a duty to competently advise the Trust Company as Trustee of Mary's Trusts.

139.    Eisenberg, Melamed and the Law Firm violated their duty of care and committed legal malpractice in their representation of the Trust Company by:

a. failing to advise the Trust Company that they were unable to provide independent and objective legal advice to the Trust Company regarding the investment and administration of Mary's Trusts due to their conflicting representations and by failing to advise the Trust Company to retain independent legal counsel;

b. failing to advise the Trust Company that the 2007 and 2008 purchases of General Growth stock for the benefit of Mary's Trusts violated the Trust Company's fiduciary duties of prudence and loyalty that it owed to Mary, Martin Michael and Stella;

c. failing to advise the Trust Company that the Freibaum and Michaels Loans violated the Trust Company's fiduciary duties of prudence and loyalty that it owed to Mary, Martin Michael and Stella;

d. failing to advise the Trust Company that the 2007 and 2008 purchases of General Growth stock for the benefit of Mary's Trusts and the Freibaum and Michaels Loans were material transactions that the Trust Company was required to disclose to Mary in advance as beneficiary and as the mother and guardian of Martin Michael and Stella; and

e. failing to withdraw from their representation of the Trust Company and all other representations relating to transactions involving Mary's Trusts due to their conflicts of interest.

140. Had Eisenberg, Melamed and the Law Firm advised the Trust Company that it was unable to provide the Trust Company independent and objective legal advice due to its conflicting representations, the Trust Company would have hired independent counsel.

141. Had Eisenberg, Melamed and the Law Firm withdrawn from representing the Trust Company, it would have hired independent counsel to advise it in its role as trustee of Mary's Trusts.

142. Independent counsel would have advised the Trust Company that the 2007 and 2008 purchases of General Growth stock for the benefit of Mary's Trusts and the Freibaum and Michaels Loans violated the Trust Company's fiduciary duties of prudence and loyalty and that the Trust Company had a duty to disclose to Mary the Trust Company's intent to engage in those transactions.

143.    Had independent counsel advised the Trust Company that the 2007 and 2008 purchases of General Growth stock for the benefit of Mary's Trusts and the Freibaum and Michaels Loans violated the Trust Company's fiduciary duties of prudence and loyalty and to disclose in advance material transactions, the Trust Company would not have proceeded with those transactions and the Trusts would not have suffered a diminution in value in excess of two hundred million dollars.

144.    Had Eisenberg, Melamed and the Law Firm advised the Trust Company that the 2007 and 2008 purchases of General Growth for the benefit of Mary's Trusts and the Freibaum and Michaels Loans violated the Trust Company's fiduciary duties of prudence and loyalty and to disclose in advance material transactions, the Trust Company would not have proceeded with those transactions and the Trusts would not have suffered a diminution in value in excess of two hundred million dollars.

145.    Eisenberg, Melamed and the Law Firm's violations of the duty of care and acts of legal malpractice as counsel to the Trust Company caused Mary's Trusts to suffer in excess of two hundred million dollars in damages.

**COUNT IV**
**MARY, MARTIN MICHAEL AND STELLA'S CLAIMS**
**FOR BREACH OF FIDUCIARY DUTY AGAINST**
**GENERAL TRUST COMPANY, EISENBERG & MELAMED**

146.    Mary, Martin Michael and Stella incorporate and reallege paragraphs 1 through 108 above as if fully set forth herein.

147.    As trustee for Mary's Trusts, the Trust Company owed fiduciary duties to Mary as beneficiary.

148.    The Trust Company also owed fiduciary duties to Martin Michael and Stella, who are remaindermen under Mary's Trusts. If Martin Michael and Stella survive Mary and

Mary does not exercise her power of appointment under the Trusts, the assets of her Trusts will be transferred to trusts of which Martin Michael and Stella will be the primary beneficiaries.

149.     The Trust Company engaged in grossly negligent conduct and breached its fiduciary duties to act with prudence, utmost loyalty and fidelity to Mary, Martin Michael and Stella by engaging in the following acts, that were not in their sole interests but instead were undertaken to benefit the interests of others:

a.     purchasing additional shares of General Growth stock by utilizing the Citi Loan during 2007 and 2008 despite the existing concentration of Mary's Trusts' assets in General Growth; and

b.     extending at least $90 million in unsecured loans to General Growth corporate insiders Freibaum and Michaels without obtaining adequate security for those loans and charging an interest rate that was inadequate to compensate Mary's Trusts for the risks associated with those loans.

150.     In addition, the Trust Company breached its fiduciary duty to inform Mary, both individually and as mother and custodian of Martin Michael and Stella, of the significant and material transactions described above and the risks associated with them before they were undertaken.

151.     The Trust Company also breached its fiduciary duties to Mary by unreasonably failing to sue the Law Firm for legal malpractice as described in Count VI of this Amended Complaint.

152.     The Trust Company's breaches of its fiduciary duties caused damages in the form of a diminution in the value of Mary's Trusts in excess of two hundred million dollars.

153.     As directors and officers of the Trust Company, Eisenberg and Melamed are personally liable for the diminution in the value of Mary's Trusts because they knowingly caused and participated in the Trust Company's breaches of its fiduciary duties.

## COUNT V
## MARY, MARTIN MICHAEL AND STELLA'S CLAIMS FOR AIDING AND ABETTING THE TRUST COMPANY'S BREACH OF FIDUCIARY DUTY AGAINST EISENBERG, MELAMED AND THE LAW FIRM

154.    Mary, Martin Michael and Stella incorporate and reallege paragraphs 1 through 108 above as if fully set forth herein.

155.    Eisenberg, Melamed and the Law Firm, as counsel to the Trust Company, aided and abetted the Trust Company in breaching its fiduciary duties to Mary, Martin Michael and Stella when the Trust Company performed certain wrongful acts, including but not limited to:

   a. purchasing additional shares of General Growth stock by utilizing the Citi Loan during 2007 and 2008 despite the existing concentration of Mary's Trusts' assets in General Growth; and

   b. extending at least $90 million in unsecured loans to General Growth corporate insiders Freibaum and Michaels without obtaining adequate security for those loans and charging an interest rate that was inadequate to compensate Mary's Trusts for the risks associated with those loans.

156.    Eisenberg, Melamed and the Law Firm knowingly assisted the Trust Company in breaching its fiduciary duties to Mary, Martin Michael and Stella by negotiating and implementing the Citi Loan, the Freibaum Loan, and the Michaels Loan, thereby causing Mary's Trusts to lose hundreds of millions of dollars.

157.    Eisenberg, Melamed and the Law Firm engaged in self-dealing when they knowingly aided and abetted the Trust Company's breach of its fiduciary duties in order to further their own financial interests and the interests of one of the Law Firm's largest clients, General Growth.

158.    Eisenberg, Melamed and the Law Firm's acts of aiding and abetting of the Trust Company's breach of its fiduciary duties caused damages in the form of a diminution in the value of Mary's Trusts in excess of two hundred million dollars.

## COUNT VI
## LEGAL MALPRACTICE AGAINST EISENBERG, MELAMED
## AND THE LAW FIRM BROUGHT ON BEHALF OF THE TRUST COMPANY
## AS TRUSTEE OF MARY'S TRUSTS

159.     Mary, Martin Michael and Stella incorporate and reallege paragraphs 1 through 108 above as if fully set forth herein.

160.     Pursuant to Section 282(2) of the Restatement (Second) of Trusts, Mary, Martin Michael and Stella bring this derivative claim on behalf of the Trust Company as trustee of Mary's Trusts against Eisenberg, Melamed and the Law Firm based on the legal malpractice committed by those Defendants in their representation of the Trust Company.

161.     Eisenberg, Melamed and the Law Firm provided legal advice to the Trust Company regarding the performance of its duties as trustee of Mary's Trusts.

162.     The Trust Company has improperly neglected to bring an action for legal malpractice against Eisenberg, Melamed and the Law Firm for the following acts of legal malpractice:

   a.     Eisenberg, Melamed and the Law Firm violated their duty of care and engaged in legal malpractice by failing to advise the Trust Company that they were unable to provide independent and objective legal advice to the Trust Company regarding the investment and administration of Mary's Trusts due to their conflicting representations and by failing to advise the Trust Company to retain independent legal counsel.

   b.     Eisenberg, Melamed and the Law Firm violated their duty of care and engaged in legal malpractice by failing to advise the Trust Company that the 2007 and 2008 purchases of General Growth stock for the benefit of Mary's Trusts violated the Trust Company's fiduciary duties of prudence and loyalty that it owed to Mary, Martin Michael and Stella.

   c.     Eisenberg, Melamed and the Law Firm violated their duty of care and engaged in legal malpractice by failing to advise the Trust Company that the Freibaum and Michaels Loans violated the Trust Company's fiduciary duties of prudence and loyalty that it owed to Mary, Martin Michael and Stella.

   d.     Eisenberg, Melamed and the Law Firm violated their duty of care and engaged in legal malpractice by failing to advise the Trust Company that

the 2007 and 2008 purchases of General Growth stock for the benefit of Mary's Trusts and the Freibaum and Michaels Loans were material transactions that the Trust Company was required to disclose to Mary in advance as beneficiary and as the mother and guardian of Martin Michael and Stella.

    e.    Eisenberg, Melamed and the Law Firm violated their duty of care and engaged in legal malpractice by failing to withdraw from their representation of the Trust Company and all other representations relating to transaction involving Mary's Trusts due to their conflicts of interest.

163.    Demand on the Trust Company to bring an action for legal malpractice against Eisenberg, Melamed and the Law Firm would be futile because the owners and directors of the Trust Company have the following conflicts of interest:

    a.    Eisenberg is both a partner at the Law Firm and the majority owner of the Trust Company, the President of the Trust Company, a member of the Trust Company's Board of Directors and one of the three members of the Trust Company's Trust Committee.

    b.    Melamed is both a partner at the Law Firm and the Secretary of the Trust Company, a member of the Trust Company's Board of Directors and the second member of the Trust Company's three member Trust Committee.

164.    Demand on the Trust Company to bring an action for legal malpractice against Eisenberg, Melamed and the Law Firm would also be futile because the Trust Company's filings in this action demonstrate that the Trust Company is unwilling to bring this claim because the Trust Company has asserted that the transactions complained of in this Amended Complaint were neither imprudent nor disloyal and did not require advance disclosure to Mary.

165.    Had Eisenberg, Melamed and the Law Firm advised the Trust Company that it was unable to provide the Trust Company independent and objective legal advice due to its conflicting representations, the Trust Company would have hired independent counsel.

166.    Had Eisenberg, Melamed and the Law Firm withdrawn from representing the Trust Company, it would have hired independent counsel to advise it in its role as trustee of Mary's Trusts.

167. Independent counsel would have advised the Trust Company that the 2007 and 2008 purchases of General Growth stock for the benefit of Mary's Trusts and the Freibaum and Michaels Loans violated the Trust Company's fiduciary duties of prudence and loyalty.

168. Independent counsel would have advised the Trust Company that it had a duty to disclose to Mary in advance the 2007 and 2008 purchases of General Growth stock for the benefit of Mary's Trusts and the Freibaum and Michaels Loans because they were material.

169. Had independent counsel advised the Trust Company that the 2007 and 2008 purchases of General Growth for the benefit of Mary's Trusts and the Freibaum and Michaels Loans violated the Trust Company's fiduciary duties of prudence and loyalty and to disclose in advance material transactions, the Trust Company would not have proceeded with those transactions and the Trusts would not have suffered a diminution in value in excess of two hundred million dollars.

170. Had Eisenberg, Melamed and the Law Firm advised the Trust Company that the 2007 and 2008 purchases of General Growth for the benefit of Mary's Trusts and the Freibaum and Michaels Loans violated the Trust Company's fiduciary duties of prudence and loyalty and to disclose in advance material transactions, the Trust Company would not have proceeded with those transactions and the Trusts would not have suffered a diminution in value in excess of two hundred million dollars.

171. Eisenberg, Melamed and the Law Firm's acts of legal malpractice to the Trust Company caused Mary's Trusts to suffer in excess of two hundred million dollars in damages.

## COUNT VII
### BREACH OF FIDUCIARY DUTY AGAINST EISENBERG, MELAMED AND THE LAW FIRM BROUGHT ON BEHALF OF THE TRUST COMPANY AS TRUSTEE OF MARY'S TRUSTS

172. Mary, Martin Michael and Stella incorporate and reallege paragraphs 1 through 108 above as if fully set forth herein.

173.     Eisenberg, Melamed and the Law Firm provided legal advice to the Trust Company regarding the performance of its duties as trustee of Mary's Trusts.

174.     As the Trust Company's attorneys, Eisenberg, Melamed and the Law Firm had a fiduciary duty to act with the utmost fidelity and loyalty to the Trust Company and its interests.

175.     Eisenberg, Melamed and the Law Firm also represented General Growth from 1993 to 2009.

176.     Eisenberg and Melamed, acting in their capacity as directors and officers of the Trust Company and members of the Trust Company's Trust Committee, breached their fiduciary duty of loyalty to the Trust Company by using Mary's Trusts' assets held by the Trust Company in an attempt to prop up General Growth's stock price by approving:

    a.     the purchase additional shares of General Growth stock utilizing the Citi Loan during 2007 and 2008 despite the existing concentration of Mary's Trusts' assets in General Growth; and

    b.     the at least $90 million in unsecured loans to General Growth corporate insiders Freibaum and Michaels without obtaining adequate security for those loans and charging an interest rate that was inadequate to compensate Mary's Trusts for the risks associated with those loans.

177.     Eisenberg's, Melamed's and the Law Firm's breach of their fiduciary duties to the Trust Company caused Mary's Trusts to suffer in excess of two hundred million dollars in damages.

178.     In addition to other damages, Mary's Trusts are entitled to disgorgement of all attorneys' and other fees paid to the Law Firm during all times when Eisenberg, Melamed and the Law Firm were in breach of their fiduciary duties to the Trust Company as trustee of Mary's Trusts.

179. Demand on the Trust Company to bring an action for breach of fiduciary duty against Eisenberg, Melamed and the Law Firm would be futile because the owners and directors of the Trust Company have the following conflicts of interest:

      a.      Eisenberg is both a partner at the Law Firm and the majority owner of the Trust Company, the President of the Trust Company, a member of the Trust Company's Board of Directors and one of the three members of the Trust Company's Trust Committee.

      b.      Melamed is both a partner at the Law Firm and the Secretary of the Trust Company, a member of the Trust Company's Board of Directors and the second member of the Trust Company's three member Trust Committee.

180. Demand on the Trust Company to bring an action for breach of fiduciary duty against Eisenberg, Melamed and the Law Firm would also be futile because the Trust Company's pleadings in this action demonstrate that the Trust Company is unwilling to bring this claim because the Trust Company has asserted that the transactions complained of in this action were not imprudent or disloyal and that it had no duty to disclose the transactions before they happened.

181. The Law Firm's breaches of its fiduciary duties caused damages in the form of a diminution in the value of Mary's Trusts in excess of two hundred million dollars.

## COUNT VIII
## MARY, MARTIN MICHAEL AND STELLA'S CLAIM
## REMOVAL OF THE TRUST COMPANY

182. Mary, Martin Michael and Stella incorporate and reallege paragraphs 1 through 108 above as if fully set forth herein.

183. The Trust Company owed fiduciary duties to Mary as primary and current beneficiary and Martin Michael and Stella as remaindermen.

184. The Trust Company breached its fiduciary duties of loyalty, prudence and to inform the beneficiaries of material transactions as described in paragraphs 149-151.

185.     The Trust Company's serious breaches of trust, including breaches of the duties of loyalty, prudence and to provide material information, warrant removal of the Trust Company as trustee of Mary's Trusts.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Mary Bucksbaum Scanlan, individually and derivatively on behalf of General Trust Company as trustee of Mary's Trusts, and Martin Michael Scanlan and Stella Clare Scanlan, by and through their Next Friend, Mary, request the following relief against Defendants Marshall Eisenberg, Earl Melamed, Neal Gerber & Eisenberg LLP and General Trust Company:

A.     That this Court order that the Defendants pay damages to restore the corpus of Mary's Trusts in an amount equal to the harm caused by their misconduct, plus interest and costs.

B.     That this Court remove General Trust Company as trustee for any trust established for the benefit of Mary, Martin Michael and Stella and for the trusts established by Mary for the benefit of others and appoint a trust company of Mary's choosing as successor trustee for those trusts.

C.     That this Court order that General Trust Company provide a complete accounting for all transactions and affairs with respect to all of the trusts established for the benefit of Mary and for the trusts established by Mary and to furnish all books and records related to such transactions and affairs.

D.     That this Court reform any trust of which Mary, Martin Michael or Stella is a beneficiary to provide the beneficiary of those trusts the power to remove the corporate trustee of those trusts with or without cause and appoint a successor corporate trustee.

E.      That this Court order Neal Gerber & Eisenberg to disgorge all attorneys' and other fees paid to it by General Trust Company or Mary's Trusts that were received by Neal Gerber & Eisenberg during all times when Eisenberg, Melamed and Neal Gerber & Eisenberg were in breach of their fiduciary duties owed to General Trust Company and Mary's Trusts.

F.      That this Court order Neal Gerber & Eisenberg to disgorge all attorneys' and other fees paid to it by Mary individually and received by Neal Gerber & Eisenberg during all times when Eisenberg, Melamed and Neal Gerber & Eisenberg were in breach of their fiduciary duties owed to Mary.

G.      That this Court order Defendants to pay damages to Mary for her attorneys' fees and costs incurred in connection with this action.

H.      That this Court award the Trusts exemplary and punitive damages from all Defendants in connection with Counts II, III, IV, V and VII.

I.      That this Court grant Mary any and all other relief that it deems just.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.


Dated: June 30, 2010                    s/ Frederick J. Sperling
                                        Frederick J. Sperling
                                        Paul E. Greenwalt, III
                                        Lawrence H. Heftman
                                        Ann H. MacDonald

                                        SCHIFF HARDIN LLP
                                        6600 Sears Tower
                                        Chicago, IL 60606-6473
                                        (312) 258-5500

                                        Attorneys for Mary Bucksbaum Scanlan,
                                        Martin Michael Scanlan and Stella Clare
                                        Scanlan

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that, on June 30, 2010, she caused a true and correct copy of the Amended Complaint to be filed electronically with the Court's CM/ECF system, which caused an electronic copy of this filing to be served on counsel of record.

s/ Ann H. MacDonald